FRED. LINCOLN v. SAMUEL H. DAVIS.

*Riparian rights on the lakes—Erections in navigable waters—Fishing rights.*

1. Riparian rights upon the Great Lakes are, in theory, the same as upon navigable streams, and are not governed by any such proprietary division as high and low water mark. The submerged lands are appurtenant to the upland so far as their limits can be reasonably identified; but in public waters the State law must determine how far rights in such lands can be exercised consistently with the easement of navigation.

2. The State can forbid any erections in navigable waters, and on navigable streams and along the Great Lakes can fix the distance beyond which private erections cannot be maintained.

3. Fishing in open waters remote from the land is a maritime business like navigation, and may be carried on with any suitable machinery, and even with stakes, wherever it does not interfere with navigation and is not forbidden by law. And in narrow streams fishing from boats with lines cannot be complained of by riparian owners, if the persons fishing have the right to be there.

4. Fish are feræ naturæ, and can be taken by any one who has the right to be on the premises.

5. Temporary occupation of open and public waters for stake-fishing cannot be wantonly interfered with so long as the occupant is engaged

53 375
65 50
65 52

53 375
69 501
69 509
69 518
69 534
69 539
69 540

53 375
77 41

53 375
89 111

53 375
102 237

53 375
110 105

53 375
127 586

53 375
137 4411

53 375
150 1142

53 375
147 1 27

in actual business and his operations do not impede navigation or amount to a nuisance causing special damages to private persons.

6. How. Stat. § 2172, in protecting the rights of riparian owners along the lakes and in the adjacent bays and inlets to exclusive fishing with stationary nets for one mile from low-water mark, establishes a valid rule. But beyond that limit one has no right, as riparian owner merely, to interfere with stake-fishing by others.

Error to Alpena. (Emerick, J.) Jan. 17.—Apr. 23.

CASE. Defendant brings error. Affirmed.

*Hatch & Cooley* for appellant.

*J. D. Turnbull* for appellee. The right of fishing in navigable waters is a common right, and if one or more individuals set up an exclusive right to a free, or several, fishery, it must be clearly shown by positive law or by grant: 3 Kent's Com. 418; the right to fish in the Great Lakes is common to all citizens and emanates from the sovereignty: Cooley on Torts 331, 367; *Crandall v. Nevada* 6 Wall. 35; the right to fish in Lake Erie and its bays is not limited to the owners of the shore, but is free to all: *Sloan v. Biemiller* 34 Ohio St. 492; the right to fish in the lakes of New Hampshire is not limited to the owners of the shore: *State v. Franklin Falls, etc.* 49 N. H. 250; in North Carolina, if the fresh water stream is navigable in fact the right to fish is public: *Wilson v. Forbes* 2 Dev. 30; *Collins v. Benbury* 3 Ired. 277; 5 Ired. 118; *State v. Glen* 7 Jones 321; the rights of citizens in the Great Lakes are the rights of navigation and of fishing: *Rice v. Ruddiman* 10 Mich. 142.

CHAMPLIN, J. Thunder Bay is a portion of the waters of Lake Huron. The bay is of considerable magnitude, being about 13 miles wide at its mouth, and extending from South Point in a north-westerly direction a distance of fifteen or twenty miles. The shores of this bay are quite irregular, and indented with smaller bays, one of considerable size being known as Squaw Bay. Sulphur Island is situated in Thunder Bay, between one and two miles from the mainland, in the western part of the bay. It contains about fifty-three acres of land, and was surveyed and sold by the United States

government as lots 1 and 2 of section 13 in township 30 North, range 8 East. This land is valuable only in connection with the fisheries in Thunder Bay. There is a channel between it and the mainland of about thirteen feet of depth of water, but the main channel used in navigation to and from the city of Alpena, which is situated upon the bay, lies north-east of the island.

The defendant at the time of the grievances complained of was the lessee, and in possession of Sulphur Island. He had been for some time engaged in the business of fishing in Thunder Bay, in front of lands owned or leased by him, and claimed that, by virtue of his lessor being the owner of Sulphur Island, he was the proprietor of the soil under the water in front thereof, and controlled the right of fishing in those waters by means of trap-nets, which cannot be used without the aid of stakes or poles driven in the ground. The plaintiff is also a fisherman, and sometime in June, 1882, caused stakes to be driven in Thunder Bay, commencing about a mile east of Sulphur Island, and thence continued eastward for a distance of about one hundred and sixty rods, for the purpose of affixing thereto trap-nets for fishing. The depth of water where the stake nearest the island was driven was twenty-six or twenty-seven feet, and where those were driven the furthest from the island the depth of water was thirty-six or thirty-seven feet. The defendant also proceeded to drive stakes near those driven by the plaintiff, and notified the plaintiff to take up and remove those placed there by him, but he refused, and the defendant pulled them up, and they floated away and were lost. The plaintiff brought trespass, and recovered under the charge of the court, which is given in full in the margin.[1]

---

[1] *Gentlemen of the Jury:* You have already perceived from the evidence in this case the great degree of importance which attaches to the correct decision of this case, not only to the parties immediately interested in this litigation, but also as affecting the rights of a large class of our citizens who are engaged, in this community, in the business of fishing in the waters of our bay and the lake. Indeed, the important character of this case will affect, if it becomes generally known, even those who carry on this business at greater distances than our own bay here at home. I think that you cannot fail to have perceived, from the instructive and

There are two questions presented by this record :

1. Is the owner of land bounded by the waters of the Great Lakes, like Lake Huron, entitled to the rights of a riparian proprietor in front of his lands, to the center of the lake?

2. If so, do such rights confer upon such riparian proprietor the exclusive right of fishing in the waters in front of his land, by means of stakes or other attachments to the soil under water?

The plaintiff bases his right of recovery upon the public

_____

able arguments of the counsel here before the court upon the law applicable to the case, that it is a question of considerable intricacy and difficulty, and I invite, as I know you will give, your earnest attention to the law of this case as I shall lay it down to you, as well as your attention to the facts in the case.

Now, gentlemen of the jury, as in all other cases of law, in this case there are two classes of questions that arise : Questions of law to be considered and determined, and questions of fact. The decision and the determination of all questions of law is exclusively for the court. And as honest jurors, whatever you may think about the rules of law that I shall give you, you will accept them implicitly as given you by the court; but upon the questions of fact you are the sole judges. Now, gentlemen, I want you to pay the most earnest attention to these matters of law, and to accept them, as I have no doubt you will from my knowledge of you as citizens and as jurors, implicitly as they are laid down to you by the court.

The plaintiff in this case, Mr. Lincoln, seeks to recover from the defendant, Mr. Davis, for the pulling up of certain stakes which he had secured in the waters of Thunder Bay, easterly of Sulphur Island; for the purpose of using them in trap-net fishery. I say, he seeks to recover damages before you for this destruction of the proposed fishery, and some other losses which he claims he is entitled to recover for before you here, and this involves at once the great and disputed right of fishing in the waters of the Great Lakes and this bay upon which we live. In the case of a river in this country, the owner of the bank owns the soil under the water to the center line or thread of the current of the stream, and that right or ownership in the soil carries with it the exclusive right of taking the fish in the waters of the river. I do not care whether the river be large or small, the same rule prevails. The same rule prevails upon the Detroit river that prevails upon the Muskegon river or the rivers of Thunder Bay. If the owner of one shore also happens to be the owner of the opposite bank, he has the exclusive right of taking the fish in the waters of the river whatever the size of the stream may be, and of absolutely prohibiting the public, if he sees fit, from taking any fish in the waters of the river whatever; and I do not care how they may get there, whether they may ascend or descend the stream, so long as they are opposite the land owned by him. He has the absolute right of controlling the fishing in the waters of the stream. But these lands do not lie upon the banks of any stream or river, and we therefore turn our attention to the determination of what the law may be in the case of land situated as this land is situated, in the waters of Thunder Bay.

The owner of land bordering upon this bay or upon Lake Huron, by

right of fishing in the Great Lakes.   By the common law, all persons have a common and general right of fishing in the sea, and in all other navigable or tide waters; and no one can maintain an exclusive privilege to any part of such waters unless he has acquired it by grant or prescription.

In the case of *Carter v. Murcot* 4 Burr. 2162, it was declared that in rivers not navigable—that is, in rivers not affected by the tides—land-owners had the right of fishing on each side, commonly, to the middle of the stream, and in navigable tide-water rivers the right was prima facie in the

reason of his ownership of the shore or upland, has the exclusive right of using the soil under the waters of the bay or lake for all purposes for which he can make use of them as pertaining to his use and enjoyment of the shore or upland itself.   He has the exclusive right of building a dock or pier out into the water for the purposes of navigation, and he has for that reason the right to charge parties that use that wharf such charges as may be reasonable or regulated by law for their use of his wharf.   He has the exclusive right of driving piles in the water in front of his land for the purpose of booming logs there, and the thousand other incidents to the use of the soil under the shoal waters lying immediately in front of his land that it may be put to for the purpose of still further enjoying the shore before it.   He has the right, too, of building mills in the shoal waters out in front of his land, and exclusively using the soil to the extent for which he may make beneficial use of it.   That is the general rule of law.   But the right of fishery, gentlemen of the jury, is a right which is limited.   I say to you, gentlemen, that under what I call the common law of this State, the owner of the shore or upland has not the exclusive right of fishing in the waters which lie before his land.   He has the exclusive right of landing upon his land for the purpose of using the waters.   No man would have the right to come there and attach any net to his shore, or to drive stakes there so as to interrupt his perfect access to and from his land, and his right to use the shoal waters in front of his land for all purposes connected with his use of the land itself.   They have no right to interfere with any of these rights of the shore-owner.   But the legislature of this State have assumed control of this matter in part, and I now lay it down to you here as the law of this case, and as the law of all similar cases, that at a point in the waters of this bay, at a distance of one mile from the shore, that persons who do not own the land itself have just as good a right to drive their stakes to put their trap-nets upon as the owner of the land itself.   Now, what is the result of this doctrine ?   It is this : If you shall find that Mr. Lincoln, sometime in the summer or spring of last year, as is not disputed from the evidence in this case, drove certain stakes, for the purpose of stringing his trap-nets upon, in the soil in the waters of Thunder Bay, at a distance of one mile or more from Sulphur Island, (which it is conceded Mr. Davis was then in the occupation of, and was attempting to use for the purpose of taking fish,) I say to you, if Mr. Lincoln drove these stakes there at a distance out I have mentioned, in water from 24 and 25 feet to 36 and 37 feet in depth, for the purpose of setting his nets there, that Mr. Davis, by reason of his owning Sulphur Island, had no right whatever under the laws of this State to interfere with those stakes, and if he did so he would be guilty of a wrongful act in pulling any of them

king, and was public; but a private person may have an exclusive right by grant or prescription.

The decisions in England have been uniformly to the effect that the owner of land bordering on streams not affected by the flow and reflow of the tides, whether in fact navigable or not, has the exclusive right of fishing in front of his land to the middle of the stream. The later cases are fully as strong as the earlier. In the case of *Malcomson v. O'Dea* 10 H. L. Cas. 618, the court said: "The soil of navigable

---

up and allowing them to float away. As to those stakes which were within the limit of one mile from the shore, Mr. Lincoln had no right to drive them there, and if Mr. Davis, after notifying him that they were in his waters, pulled them up and allowed them to float away, for those stakes which were so pulled up, unless it was done wickedly and maliciously, no damages will arise from which this plaintiff can recover in this action. But as to those stakes of the plaintiff, Mr. Lincoln, which he had driven in the waters of Thunder Bay at a distance of one mile and more from the shores of Sulphur Island, I say to you that there is nothing in the proofs of this case as to Mr. Davis' ownership of Sulphur Island, and his occupation and rights there, which would entitle him to remove Mr. Lincoln's stakes, and if he did so he would be liable in this form of action for the damages which accrued. If you do not find that Mr. Davis removed these stakes that would, of course, stop this case. If you find, from the facts conceded here and the evidence, that Mr. Davis did remove these stakes, it is for you to determine—*first*, what portion of them were beyond the distance I have spoken of, and if you shall find that Mr. Davis did remove these stakes, then determine what the damages were, under the rules of the law as I shall give them to you at this time. In the first place, he would be entitled to recover his actual damages, if he is entitled to recover at all, and that would be the value of the stakes as they stood there in the water, and that, I think, as has been very reasonably claimed to you by the plaintiff's counsel, and conceded by the defendant's counsel, would be the cost of the stakes and the cost of putting them there.

It is for you to determine, gentlemen, what was the actual loss which Mr. Lincoln suffered, if he suffered loss, from the removal and destruction of the stakes which he had placed in the water ; that is a question of fact for you to determine, and it is referred to you entirely upon the facts in this case. He may have suffered other damages, perhaps, and it is also for you to determine if he did, and if so what they were. These stakes were erected there in the water by Mr. Lincoln for a purpose—for the purpose of stringing two trap-nets upon. He had the twine, the nets, to put upon these stakes. After having these stakes removed by Mr. Davis, he did not lie still with his two nets, and he ought not to have done so, and attempted to recover from this defendant here the profits which he might have made from those two nets, but he did as he had a right to do, and that was to put those nets in other water and in as favorable a location for catching fish as he could, and if he suffered a loss, occasioned by the act of the defendant in removing those stakes from where they were and compelling him to get a less favorable place to put in his nets, he would be entitled to recover in this action, as a part of his actual loss, his loss in profits. In other words, what he suffered by being

tidal rivers, like the Shannon, so far as the tide flows and reflows, is prima facie in the crown, and the right of fishery, prima facie in the public. But for Magna Charta, the crown could, by its prerogative, exclude the public from such prima facie right, and grant the exclusive right of fishery to a private individual, either together with or distinct from the soil. And the great charter left untouched all fisheries which were made several, to the exclusion of the public, by act of the crown not later than Henry II." In *Murphy v. Ryan* 2 Ir.

---

compelled to remove to a less favorable place. He would be entitled to recover the difference between what he would have made from his nets where they were put in the first place, and what he did make as his profits in the place where he was compelled to put them, if that was the best place he could obtain under the circumstances. That is another question of fact for you to determine from the evidence in this case, if you are able to, as well as you can, what that loss was, if any occurred to the plaintiff. And those are the elements: *first*, all the actual loss occasioned to the plaintiff, Mr. Lincoln, if he is entitled to recover. Of course, in cases of this kind, where the plaintiff has been deprived of any of his legal rights, if you find that he has been so deprived under the law as I have given it to you, the actual loss which he has sustained is incapable of being ascertained in dollars and cents. But that is not the fault of the plaintiff. That is the result of the circumstances under which these cases happen, and it is for you to ascertain this loss, if you find he has sustained loss, to the best of your ability under the circumstances.

There is also a claim on the part of the plaintiff for damages, in the nature of exemplary damages, or punitory damages, against the defendant. Upon that subject I want to speak very carefully to you. Punitory or exemplary damages, as they are called, is a term which is applied in law to damages which are sometimes allowed to a plaintiff where the act of the defendant has been particularly willful and malicious, and done knowingly wrongfully, for the purpose of punishing the defendant. The law allows such damages as that to be recovered in a proper case. That is in a case which discloses facts justifying it. But you would not be justified in this case in inflicting any such damages, if you believe that Mr. Davis, in removing the stakes of Mr. Lincoln, which he did, acted in good faith, under advice of counsel, and under an honest belief that he had a right to remove these stakes. In order to recover any such damages as that, the plaintiff must satisfy your minds, by a preponderance of the evidence of the case, that the defendant, in the act which he complained of, acted knowingly and willfully and maliciously, and in utter disregard of the rights of others, intending to do what he knew would be a wrongful act, for the purpose of injuring the plaintiff in this case. I say, in considering that question, you are to find it, if you find it at all, from the consideration of all the facts and circumstances in the case, and that by a preponderance of evidence, indeed, in a civil case like this is, you must find all the elements which go to make up the plaintiff's case, by a fair preponderance of all the evidence. If you find for the plaintiff in this case, you will specify in your verdict the amount of damages which you find. On the other hand, if you find for the defendant, you will simply say he is not guilty.

R. C. L. 143, it was held that the public could not acquire, by immemorial usage, any right of fishing in a river in which, though navigable, the tide did not ebb and flow; and to the same effect is *Hargreaves v. Diddams* L. R. 10 Q. B. 582. In *Johnston v. Bloomfield* 8 Ir. R. C. L. 68, (Exch. Cham.,) it was held that the public has not, of common right, a common of fishery in large inland waters, in which the tide does not flow and reflow, although they are navigable. A case decided in the House of Lords in 1878, and cited as *Bristow v. Cormican* L. R. 3 App. Cas. 641, was where the plaintiff brought trespass against the defendant to establish a right to a several fishery in Lough Neagh. Defendant alleged that the several fishery and the lands covered with water were, and from time immemorial had been, part of an inland sea, called Lough Neagh, and that said inland sea had been a common or public navigable inland sea, and that, in the part thereof mentioned, every subject of the realm had, and of right ought to have, the right and privilege of fishing, and that, in the exercise of that right he committed the trespass complained of. The plaintiff claimed the right to fish through a royal grant from Charles II., in 1660, and another in 1661 of the right to fish in Lough Neagh. No evidence had been given of forfeiture, or escheat, or other source of title in the king. Lord Cairns said: "The crown has no de jure right to soil or fisheries of a lough like Lough Neagh." He then proceeds to describe Lough Neagh as "the longest inland lake in the United Kingdom, and one of the largest in Europe. It is from fourteen to sixteen miles long, and from six to eight miles broad. It contains nearly 100,000 acres; but though it is so large, I am not aware of any rule which would, prima facie, connect the soil or fishings with the crown, or disconnect them from the private ownership either of riparian proprietors or other persons." And Lord Blackburn said: "The property in the soil of the sea and of estuaries and of rivers in which the tide ebbs and flows is prima facie of common right vested in the crown. It is clearly and uniformly laid down in our books, that where the soil is covered by the water forming

a river in which the tide does not flow, the soil does of common right belong to the owners of the adjoining land; and there is no case or book of authority to shew that the crown is of common right entitled to land covered by water, where the water is not running water forming a river, but still water forming a lake. * * * I own myself to be unable to see any reason why the law should not be the same, at least where the lake is so small, or the adjoining manor so large, that the whole lake is included in one property. Whether the rule that each adjoining proprietor, where there are several, is entitled usque ad filum aquæ should apply to a lake is a different question. It does not seem very convenient that each proprietor of a few acres fronting on Lough Neagh should have a piece of the soil of the lough many miles in length tacked on to his frontage. But no question arises in this case as to the rights of the riparian proprietors amongst themselves, for no title is made by either party through any one as riparian owner. It is, however, necessary to decide whether the crown has of common right a prima facie title to the soil of a lake; I think it has not."

It is evident from the foregoing citations that the question in England, as to riparian proprietorship in the soil under lakes, had not been judicially settled as late as the year 1878. The holding that the crown does not of common right prima facie own the title to the soil under the waters of an inland lake, leads necessarily to the other conclusion, that such soil belongs to the riparian proprietor. But the case can form no guide with reference to riparian ownership upon the great inland seas bordering this State. Lough Neagh, the largest in the United Kingdom, is too small to be the subject of any comparison with Lake Huron, with the object of ascertaining by any analogy whether the rules or principles of riparian ownership applied to one should govern the other.

It was the theory of monarchical governments that the king was lord of the sea, and the owner of the soil while it was covered with water. 2 Bl. Com. 262. This is a reasonable doctrine, and founded in good sense. It would be absurd to suppose that any private person could appropriate

to his own exclusive use either the waters of the sea or the soil beneath it. The public right of navigation and fishing in such waters should not be rendered subservient to private occupancy. Title by occupancy presumes a grant. There must be an owner capable of granting before a grant can be made. If there be no owner there can be no grant, and no title by prescription. And so the common law regarded the sovereign as owner, and as holding the title in trust for the public use of navigation and fishing, and such uses as should subserve the general welfare. The same reasons which existed during the origin and growth of the common law to deny the right of riparian proprietorship in the bed of the sea forbid such private proprietorship in the owner of land bordering on the Great Lakes. "All titles in this State are supposed to have been granted or originally recognized and confirmed by the United States or by this State." *Gamble v. Horr* 40 Mich. 564. That is from the sovereign power. Before the admission of this State, the United States, as sovereign, had political jurisdiction of the whole area, including the navigable waters of the Great Lakes, and when the State was admitted into the Union this political jurisdiction devolved upon the State, and the title to the soil under the navigable waters of the Great Lakes became vested in the State, as sovereign to the same extent and for the same reasons that the title of the bed of the sea was vested in the king.

If the defendant has any title to the land under the waters of that portion of Lake Huron known as Thunder Bay, he must have derived it either by a grant from the United States or from the State of Michigan. He claims it by grant from the United States, and in virtue of his riparian proprietorship in Sulphur Island, and that as a concomitant of this interest in the soil he has the exclusive right of fishery in the waters of the bay in front of the island, at least so far as the driving of stakes in the soil and the use of trap-nets is concerned. What, then, are the boundaries of the grant made by the United States government of the land on Sulphur Island? I have no hesitation in saying that they

are limited by low-water mark. I think the true principle is laid down in the following cases: *Canal Com'rs v. People* 5 Wend. 423; *Champlain &c. R. R. Co. v. Valentine* 19 Barb. 484; *Fletcher v. Phelps* 28 Vt. 257; *Jakeway v. Barrett* 38 Vt. 316; *Austin v. Rutland R. R. Co.* 45 Vt. 215; *Seaman v. Smith* 24 Ill. 521.

In *State v. Gilmanton* 9 N. H. 461, Chief Justice Parker said: "Where a grant is made extending to a river, and bounding upon it, the centre of the stream is the line of the boundary, if there is no limitation in the terms of the grant itself. But in relation to grants bounding on ponds, lakes, or other large bodies of standing fresh water, that principle does not apply, but the grant extends only to the water's edge." See also 3 Kent's Com. 429, and note *b.;* Gould on Waters § 203 and cases cited in note 3; Angell on Water-courses §§ 41, 42. Such also is the construction placed upon grants of the United States by the United States Supreme Court. *Barney v. Keokuk* 94 U. S. 324; *Railroad Co. v. Schurmeir* 7 Wall. 272.

In England, where the common law had its origin, there were no great inland seas, such as our Great Lakes, and consequently no precedent can be found in the jurisprudence of that country which determines the applicability of the common-law doctrine of riparian rights to the question under consideration. Lake Huron is estimated to contain 20,000 square miles, while the Irish Sea is computed at less than 15,000. Lake Michigan contains more than twice, and Lake Superior about four times the number of square miles contained in the Irish Sea.

If we look for analogies, they will be found to consist in the resemblance of the Great Lakes to the seas which surrounded that country, and would seem to call for the application of the same principles as to boundaries which were applied to lands bordering on those seas, with this difference: as there is no periodical ebb and flow of tide in these waters the limit should be at low instead of at high water mark. The paramount rights of the public to be preserved are those of navigation and fishing, and this is best accom-

plished by limiting the grants of lands bordering on the Great Lakes to low-water mark. It does not follow, however, that the owner of lands thus bounded has no rights to the use of the water or the soil beneath it. It is well settled in this country, that where the law is that the owner is limited by either high or low water mark, he has the right to con. struct warehouses, wharves or piers in the water in front of his land, in aid of and not obstructing navigation. *Railroad Co. v. Schurmeir* 7 Wall. 272; *Yates v. Milwaukee* 10 Wall. 497; *Providence Steam-engine Co. v. Providence etc. Steamship Co.* 12 R. I. 348; *Coburn v. Ames* 52 Cal. 385; *Mather v. Chapman* 40 Conn. 382; *Drury v. Midland R. R. Co.* 127 Mass. 571; *Boston v. Richardson* 105 Mass. 351; *Lakeman v. Burnham* 7 Gray 437; *State v. Sargent* 45 Conn. 358; *Moulton v. Libbey* 37 Me. 472; *Clement v. Burns* 43 N. H. 609. In some states this right is said not to exist without legislative authority. *Tinicum Fishing Co. v. Carter* 61 Penn. St. 21; *Garitee v. Baltimore* 53 Md. 432; *Alden v. Pinney* 12 Fla. 348; *Norfolk City v. Cooke* 27 Grat. 430; *Rice v. Ruddiman* 10 Mich. 125.

The defendant claims that the decisions of this Court have settled the question of riparian ownership to lands bordering upon the navigable waters of this State, and that by such decisions his rights as such owner covers the locus in quo in this case; and he cites us to the following cases: *Rice v. Ruddiman* 10 Mich. 125; *Bay City Gas-Light Co. v. Industrial Works* 28 Mich. 183; *Pere Marquette Boom Co. v. Adams* 44 Mich. 404; *Watson v. Peters* 26 Mich. 517; *Lorman v. Benson* 8 Mich. 18.

None of the foregoing cases involved the rights of riparian owners of land bounded by the waters of the Great Lakes. In the case of *Rice v. Ruddiman,* Lake Muskegon was treated by three of the judges as a widening of the Muskegon river, but the majority of the Court based their decision upon the well-recognized principle that the owner of the shore had the right to make use of the shallow waters in front of his premises, by the construction of wharves, buildings and other improvements, so long as the public servi-

tude was not thereby impaired, and it was immaterial whether the particular place in controversy was a part of Lake Michigan or not. The case of *Pere Marquette Boom Co. v. Adams* was clearly the case of a river, although called Pere Marquette lake. This lake is formed by a widening of the waters of the river before they reach Lake Michigan, and no reason ·is apparent why the principles applicable to rivers should not govern the rights of riparian proprietors upon this so-called lake.

The defendant calls attention to the case of *Richardson v. Prentiss* 48 Mich. 88, as deciding the very point in issue, and claims that it was there held that the owner of lands upon the shore of Thunder Bay does own the soil under the water in front of his upland, and has the exclusive enjoyment of the usual riparian right appurtenant thereto, and he insists that the only question to be considered is the extent of those rights, and that, subject to the right of navigation, there is no limit of distance from the shore, save only the central thread of the stream or center line of the lake, and that there is no limit at all to the depth of water in which he may exercise his right. If the position is correct that the owner of land bounding on Thunder Bay has the same riparian rights that the owner of land bounded by a river or other stream has, then there can be no question as to his exclusive right to fish in the waters where plaintiff had attempted to, in this case, and that plaintiff was a trespasser, and defendant was justified in removing the stakes driven by plaintiff, for the law is well settled that riparian proprietors upon fresh-water streams have the exclusive right of fishing in the waters opposite their lands. Gould on Waters § 182, and cases cited in note 1; Angell on Water-courses § 61; *Hart v. Hill* 1 Whart. 124; *Beckman v. Kreamer* 43 Ill. 447.

The case of *Richardson v. Prentiss* does not conflict with the views I have expressed. Although the case discusses the rights of riparian owners, and refers to them generally in the language of the authorities as extending ad medium filum aquæ, yet the case presented was whether a person,

after selling to complainant land bounded by the waters of the lake, could go in front of complainant and appropriate the land under the water. The grantor had no more right to exercise exclusive dominion over the soil under the water in front of the lands of her grantee than an entire stranger; and it is clear upon all the authorities that complainant had certain riparian rights flowing from her, being the owner of the shore, which neither her grantor nor any other person could deprive her of without her consent. The question to be decided was whether the complainant's grantor, after selling the shore to complainant, had riparian rights in front of the lands sold which she could appropriate to her own private and exclusive use, and it was held that she had not, and that the complainant had a right to be protected against the unauthorized appropriation of such land which would deprive her of her access to the water.

I have already cited numerous authorities to show that riparian rights exist on the banks of waters, whether navigable or not navigable, whether subject to ebb and flow of tide or not. The subject is fully discussed and authorities collated in Gould on Waters §§ 124, 140, 149.

There is nothing in the previous decisions of this State which determines the defendant's exclusive right of fishing at the point stated in the declaration. I think that the waters of Thunder Bay are public waters, and the right of fishing therein is a common right of all the citizens of this State, subject only to the paramount right of navigation, and is the subject of legislative control. Angell on Tide Waters §§ 124, 21, 22; *McCready v. Virginia* 94 U. S. 391; *State v. Company* 49 N. H. 250; *Sloan v. Biemiller* 34 Ohio St. 492; 3 Kent's Com. 418. These fisheries are beginning to assume great commercial importance. The census report for the year 1880 shows that the capital invested in the fisheries of this State was nearly half a million of dollars, employing seventeen hundred and eighty-one men, and the value of the product was nearly three quarters of a million dollars.

The State has already taken the subject under its control. There is a permanent board of fish commissioners, and laws

have from time to time been passed regulating the time and manner of catching fish. How. Stat. ch. 63. Section 2172 of this chapter provides:

" It shall be unlawful for any person or persons to put into any of the waters fronting or bordering land where fish are taken by the legal owner or occupant of such lands, any vessel or ship ballast, stone, sand, coal cinder, ashes, log slabs, decayed wood, bark, saw dust, or obstruction, or filth of any other description, or to place or drive any pound net piles or stakes, or any other piles or stakes, or posts, or build any platforms or piers, or any species of seines or continuous trap nets, to the extent of the breadth of such legal owner or occupant's lands so far as the channel banks of the rivers, and to one mile from the beach or shore, at low-water mark of the lakes, straits, inlets and bays on said waters fronting such owner or occupant's lands, and it shall subject any boat-owner, or captain of any vessel, to a fine of not exceeding fifty dollars, who shall willfully run into or molest any pound net, trap or other stationary nets, or fixtures set in the lakes for fishing purposes."

This statute protects the defendant in the exclusive right within one mile from the shore of Sulphur Island, but beyond that limit the right of fishing is common, and the public have equal rights there. It appears to me that the statute has protected the defendant to the full extent he can reasonably ask, and when he went beyond that limit and pulled out and destroyed plaintiff's stakes, he was liable to an action for the damages occasioned thereby.

The judgment is affirmed.

CAMPBELL, J. I agree in holding that the riparian owner in this case had no right to interfere with the fishing apparatus of plaintiff. But I do not entirely agree with the views expressed by my brother Champlin as to the character of aquatic rights in the lakes. I think there is no doubt of the right of the owner of lands on the borders of the lakes to make such use of the covered lands adjacent as will not injuriously affect navigation ; and that there is no such proprietary division known on these waters as high or low-water mark. I agree that it depends on the law of the State how far rights

may be exercised consistently with public easement of navigation in the submerged lands. But I regard it as settled by the common law of this State that such rights exist, so far as they can be reasonably enforced and identified.

But there are two difficulties in the way of defining these rights on our large lakes, as they might be and are defined in the narrower waters connecting the lakes. One is the impossibility of defining the boundaries where there is no filum aquæ; and the other is the public character of the waters which gives the State a much larger control than over strictly private waters.

In carrying out lines of ownership in narrow streams, it is easy to find the general course of the stream, and to draw lines perpendicular to that course from the terminal shore lines. But on lakes all lines from the shore tend to converge in some central part of the lake, and while irregularity of shape prevents drawing them to a common center, they must all, if protracted, cross each other in a perplexing way. The rule adopted in such waters, where the whole surface could be appropriated, has always been to divide the water area in proportion to the shore frontage, and never to attempt any division by lines run from the shore, except over such parts of the lake as are substantially adjacent to the shore. In some cases by a fair partition, a shore-owner would, by his extent of shore-line, obtain a share beyond the center. But it seems impossible, if the whole water is to be regarded as divided up, to reach a division without some proceeding in the nature of a partition, which will fix the various possessions.

This would be practically impossible in such bodies of water as are great commercial ways, and lie within different states and nations. And in navigable waters, it becomes a purely theoretical question in most cases, except where adjacent riparian owners may jostle each other near the shore-line in their improvements or local occupation.

There can be no doubt of the right of the state to forbid any erections within such parts of the water as are strictly navigable, and to regulate the distance beyond which no private erections can be maintained. This has been done on the

waters in question, and beyond the prescribed distance any use of the water and bottom for fishing, or other appliances, must be valid or invalid on other principles than those which govern nearer the land. The stakes removed were all in deep water, which was navigable for large craft, although not much used for navigation proper, and they could not as a matter of right have been planted by either plaintiff or defendant so as to be maintainable against the interests of navigation. So long as they did not operate as nuisances in fact, they could not be removed wantonly, and if nuisances, they could not be removed by any private person who did not suffer special damages from them as nuisances. But there could be, I think, no proprietary right in any one, at such a distance from the shore, to claim a monopoly of fixing such stakes in deep water, where they would be technical encroachments in the water-way, if not justified by some use belonging to the water instead of appurtenant to the land. The temporary occupant cannot be crowded out of his occupancy while engaged in actual business.

Outside of the statutory line I think there can be no doubt of the right of any one to fish with such appliances as are appropriate to open-water fishing. It has always been customary on these lakes to treat deep-water fishing and navigation as resting on the same basis, except in narrow waters or near shore, where fixed apparatus might have some relation to riparian occupancy as used in connection with it. Fishing such as was involved in this controversy has no natural connection with the dry land or its approaches. It is carried on altogether by the aid of vessel or boat navigation, and is fairly incidental to that class of business. Such fishing as is done with lines from boats, even in narrow streams cannot be complained of by riparian owners. The fish are like any other animals feræ naturæ, and in this region have always been regarded as open to capture by those who have a right to be where they are captured. On the large open waters there is no reason, except public convenience, which can make it improper to fish with the aid of any machinery or apparatus suitable to the business; and if stakes or similar devices are

used, and the public authority does not see fit to intervene, no one else can do so who is not hindered in the exercise of those rights of navigation which are open to everybody. Such injuries are very unlikely, as those using the Great Lakes as highways should pay a due regard to all of the various uses to which the waters are subject, and cannot wantonly interfere with any of them. I can see no reason why open-water fishing is not as essentially a maritime business as any other use of the water.

I am not prepared to hold, however, that lands under water are not appurtenant to the upland so far as they can be used at all. But, as already suggested, the impossibility of determining what part of a lake of many hundred miles shore-line, in two jurisdictions, can be made appurtenant to a mile or two of shore, renders it certain that, without some such statute as we have on the subject, even the shore approaches might in some cases be found very difficult of allotment. I therefore concur in regarding this statutory rule as entirely valid in regulating rights in deep water, and as better adapted to reaching practical results than any theoretical rules, which can never be applied on such large bodies of water at any considerable distance from the shore.

I agree in affirming the judgment.

COOLEY, C. J., and SHERWOOD, J. concurred.