WILLIAM R. JONES v. SETH LEE.

*Ejectment—Riparian rights—Surveyors.*

1. Plaintiff brought ejectment to recover part of a lot in the city of Muskegon, running to Muskegon lake, the real controversy being over part of a wharf in the lake entirely outside of the shore. Judgment passed for plaintiff below, and in reviewing the case it is held that there is an entire absence of legal proof of what plaintiff owns, in fact or in theory; that the maps and other testimony give no such means of adjustment as would

authorize the Court to deal with the abstract questions pre-
sented, nor would it be desirable to do so at all; in view of the
clear proof, not in any way controverted, that, as a matter of
fact, the possession of defendant has been under an actual,
defined occupancy very much longer than would cut off any
theoretical rights to the contrary if they existed.   This testi-
mony was to the effect that, between 20 and 30 years before
suit, a line of piles was driven for the purpose of fixing
boundaries, which would exclude from plaintiff's occupancy all
of the disputed territory, which act is held to have been the
most unequivocal assertion that could well be made, when
followed up by the use of the line as a boundary, of such
active and business possession as can be had of land under
water.

2. The following general propositions are summarized from the
opinion of Mr. Justice CAMPBELL:

*a*—No occupancy, in hindrance of free navigation, of the
waters of a deep navigable lake, can be lawfully enjoyed.

*b*—There is no rule of law which will authorize a body of
water, merely because it is a theoretical expansion of a river,
to be treated as anything but a navigable lake (if so in fact),
which would not put the expansions of the St. Lawrence on a
similar footing.

*c*—A river is characterized by its confining channel banks,
which give it a substantially single course throughout. . A lake
occupies a basin of greater or less depth, and may or may not
have a single prevailing direction.

*d*—If this body of water (Muskegon lake) were not navigable,
and if all its waters could in any way be apportioned among
the riparian proprietors for any lawful purpose, it must be
done by some rule of proportion, which probably could only be
got at by some partition proceeding, inasmuch as such waters
are common for all ordinary uses, unless placed in a different
position by the public surveys, as has been done in many
instances of small so-called "lakes," not navigable; citing *Clute
v. Fisher*, 65 Mich. 48, and cases cited.   But, as this lake is
navigable and large, the riparian rights (which, for all avail-
able purposes of a possessory nature, must be confined with
reference to the paramount rights of navigation) depend on
those principles which apply where immediate dependence on
the *filum aquae* or middle thread is impracticable; citing *Rice
v. Ruddiman*, 10 Mich. 125; *Lincoln v. Davis*, 53 Id. 375; the
chief value of which rights must refer to the access to naviga-
tion and use with reference to it of the space near the
shore, and not to the area of deep water which cannot be

appropriated, as was indicated in those cases and others elsewhere.

e—We have had occasion, in several instances, to point out that a surveyor cannot be allowed, under any circumstances, to fix private rights or lines by any theory of his own. Before his evidence can be received at all, it must be connected with the starting points and other places or lines called for by the grants under which the parties claim. His duty is neither more nor less than to measure geometrically in accordance with those *data*, and his science goes no further. It ·is not his business to decide questions of law, or to pass upon facts that belong to the tribunal dealing with the decision of facts. His testimony, as a man of science, is never receivable except in connection with the *data* from which he surveys, and if he runs lines they are of no value unless the *data* are ·established from which they are run, and those must be distinctly proven, or there is nothing to enable any one to judge what is the proper result.

Error to Muskegon. (Russell, J.) Argued July 10, 1889. Decided October 18, 1889.

Ejectment. Defendant brings error. Reversed. The facts are stated in the opinion.

*Blair, Kingsley & Kleinhans,* for appellant, contended:

1. Where there is an honest doubt about boundary lines, the parties can settle their claim by parol agreement, and possession taken and acquiescence, for even less time than the statute of limitations, will be· a bar, even in ejectment; citing· *Smith v. Hamilton,* 20 Mich. 433; *Joyce v. Williams,* 26 Id. 332; *Diehl v. Zanger,* 39 Id. 601.

*Smith, Nims, Hoyt & Erwin,* for plaintiff, contended:

1. On all of the questions mooted there was a conflict of testimony, and the findings of fact end the question on this record; citing *Johnson v. Crispell,* 43 Mich. 261; *Farrington v. Sexton,* 43 Id. 454; *Green v. Gill,* 47 Id. 86; *Irwin v. Schlief,* 48 Id. 237; *Kane v. Stowe,* 50 Id. 317; *Neumann v. Mining Co.,* 57 Id. 104, 105.

·2. If a river has a straight course, or one nearly so, every one's equity would be preserved by extending the line of division of the two parcels from the meander line to the center line of the river as nearly as possible at right angles to the general course

of the river at that point. When the stream is very crooked, and especially if there are short lines, so that the foregoing rule is incapable of strict application, it is sometimes very difficult to determine what shall be done, and in many cases the surveyor may be under the necessity of working out a rule for himself; and while such action is not conclusive, yet if he establishes a rule that follows as nearly as the circumstanc·s will admit the general rule above indicated, so as to divide as near as may be the bed of the stream among the adjoining owners in proportion to their lines upon the shore, his division, being that of an expert made upon the ground, and with all available light, is likely to be adopted as law for the case; citing Cooley, Judicial Convictions of Surveyors, 7, 8, 9.

3. Each riparian lot-owner ought to have a line on the legal boundary, namely, a center line of the stream, proportionate to the length of his line on the shore, and the problem in each case is how this is to be given him; citing *Lorman v. Benson*, 8 Mich. 18; *Rice v. Ruddiman*, 10 Id. 126; *Clark v. Campau*, 19 Id. 323, 329; *Ryan v. Brown*, 18 Id. 196; *Backus v. Detroit*, 49 Id. 115; *Cole v. Wells*, Id. 452; *Fletcher v. Boom Co.*, 51 Id. 277, 281; *Lincoln v. Davis*, 53 Id. 375; *Deerfield v. Arms*, 17 Pick. 41; *Rust v. Corporation*, 6 Id. 158.

4. A parol agreement long acquiesced in, to settle a boundary, must be an honest attempt to determine a doubtful line; otherwise the authorities have not permitted the agreement to stand, which would operate as a violation of the statute of frauds; citing *Smith v. Hamilton*, 20 Mich. 433, 438; *Joyce v. Williams*, 26 Id. 332; *Stewart v. Carleton*, 31 Id. 370; *Cronin v. Gore*, 38 Id. 384; *Terry v. Chandler*, 16 N. Y. 354; *Jackson v. Van Corlaer*, 11 Johns. 123; *Jackson v. Ogden*, 7 Id. 238; *Kellogg v. Smith*, 7 Cush. 375.

5. The mere driving of piles with the consent of plaintiff's grantors does not preclude him from contesting this as a boundary, nor does the occupancy to the line of piles by defendant's grantors, unless adverse for the full period required by the statute of limitations; citing How. Stat. § 8698; *Bunce v. Bidwell*, 43 Mich. 542, 554; *Chapman v. Crooks*, 41 Id. 595, 597; and even a written agreement that the parties shall survey a line is not conclusive, though acted on; citing *Thayer v. Bacon*, 3 Allen, 163; *Russell v. Maloney*, 39 Vt. 580; *Vosburgh v. Teator*, 32 N. Y. 561; 3 Washb. Real Prop. 87, 88.

CAMPBELL, J.   Plaintiff recovered below in an action of ejectment which purported to be brought to recover

a part, 100 feet wide, of block 1, in Muskegon, running from Water street to Muskegon lake, with its riparian rights. The real controversy was concerning part of a wharf in the lake entirely outside of the shore. The case was tried on the merits, and no question is made on the declaration. The court found certain facts, and refused to find others. Exceptions were taken to rulings on evidence and to the decision on the facts and law involved in the conclusions.

Upon the theory relied on by plaintiff, the case which he presented did not show all the facts necessary to base his claim upon, and the record does not anywhere supply the defect. The defendant, however, showed a state of facts which it was claimed made out a complete defense to any possible theory which plaintiff could make out, and this was so presented as to require us to pass upon it. A reference to the nature of the controversy is therefore important.

The city of Muskegon, succeeding the village of that name, includes a large share of the south-easterly shore of Muskegon lake, and, as we gather from the charter, nearly half of its bed. Enough appears from the maps in evidence to show, what the statutes indicate, that it is bounded by fractional sections. The maps also show, —what possibly might also be inferred otherwise,—that the lake is of considerable size, bordering on several sections, and approaching an oval or elongated shape, with more or less indentations. The Muskegon river enters it on the south-easterly side towards the north-east end. The testimony does not precisely locate its outlet, which we know, however, and possibly are bound judicially to know, leads by a short passage into Lake Michigan. The record does not show, and we have no means of knowing, whether it has always emptied in the same place.

This lake appears distinctly to be a deep, navigable lake, and it appears that deep water is found near the shore, and that the wharf in question is built and used for the purposes of lake navigation. It does not appear whether the city of Muskegon has established a dock-line, as authorized or required by its charter. But the waters are of such a nature that no occupancy in hindrance of free navigation could be lawfully enjoyed. There is no rule of law which would authorize this body of water, merely because it is a theoretical expansion of a river, to be treated as anything but a navigable lake, which would not put the expansions of the St. Lawrence on a similar footing. A river is characterized by its confining channel banks, which give it a substantially single course throughout. A lake occupies a basin of greater or less depth, and may or may not have a single prevailing direction.

It appears clearly enough in the present case that while there is a considerable frontage facing north-west or south-east, the lake being longest in that direction, there must also be large end frontages, which look up or down the lake perpendicularly, or nearly so, to any line across from bank to bank, at most places along the shores. If this body of water were not navigable, and if all its waters could in any way be apportioned among the riparian proprietors for any lawful purpose, it is evident that it could not be done by reference to any *filum aquæ* or middle thread, but must be done by some rule of proportion, which probably could only be got at by some partition proceeding, inasmuch as such waters are common for all ordinary uses, unless it may have been placed in a different position by the public surveys, as has been done in many instances of small so-called "lakes," not navigable. See *Clute v. Fisher*, 65 Mich. 48 (31 N. W. Rep. 614), and cases cited. But, as this lake is navigable and large, the riparian rights (which, for all available purposes

of a possessory nature, must be confined with reference to the paramount rights of navigation) depend on those principles which apply where immediate dependence on *filum aquæ* is impracticable. This was fully recognized in *Rice v. Ruddiman*, 10 Mich. 125, and *Lincoln v. Davis*, 53 Id. 375 (19 N. W. Rep. 103). The chief value of riparian rights, in such a case, must refer to the access to navigation and use with reference to it of the space near the shore, and not to the area of deep water which cannot be appropriated, as was indicated in those cases and others here and elsewhere.

It appears, furthermore, that the place in controversy is near the land end of an open bay of considerable size, extending across more than one government subdivision, but just how many does not positively appear. It also appears that the immediate boundary between the parties is in a subdivision of the shore end of a part of a government fraction, which is lot 1, in section 19, in township 10 N., of range 16 W. Whatever water-rights belong to any part of that subdivision must necessarily fall within those that belonged to the whole of it at the time when it was made ready for sale by the United States government, and no change, if any took place, in the shore line could enlarge that grant at the expense of any other. It is also beyond question that any owner of water-rights within that subdivision could determine for himself in what way he would subdivide and parcel out his own property. The evidence of these smaller subdivisions, although not as full as it might be, clearly indicates from the direction of the lot lines that their water-lines were to extend inward towards the curved channel bank, as is usual in all city water-lots intended to reach navigable dock-lines. While it is not necessary, or, perhaps admissible, for us to act on exhibits that are all imperfect without further proofs, there is in the case, so far as we dis-

cover, no legitimate evidence of any purpose to allow plaintiff's lot to cut off the water-front of the much larger premises westward of him, as is done by this judgment.

But when we look at the record we find an entire absence of legal proof of what plaintiff owns in fact or in theory. It has already been suggested that the first step in any such proof would be to ascertain what were the water boundaries of the whole government subdivision. But in this case the only proof of anything was evidence of the land-lines of plaintiff, and a surveyor's assumed technical knowledge of the right method of division, with no *data* of any definite character to found it on. He assumed that the general rule, in such a case, was to run perpendiculars from the thread of what he treated as a stream to the shore; that in case of a bay or similar variation of coast-line some sort of base-line should be run across, and the space on that line divided up into lengths proportionate to the respective shore-fronts of the land-lots, and each lot to have lines drawn from the shore-ends to these base-line divisions. In this case the surveyor's testimony was that he started one end of his base-line about 250 feet from shore, in deep water, at a point on a dock a considerable distance outside of lot 1, in section 19, and ran it in a direction which must have crossed what he regarded as the thread of the stream, not to the shore anywhere, but to the end of a breakwater or erection in the water, also at a considerable distance from the shore. He gave no survey or *data* from which a survey or plat might be located, so as to enable any one else to test his accuracy, or determine how far, according to his own theory, his notions were correct. He was also allowed, against objection, to give his opinion as a fact, in one or two instances, without reference, on his direct examination, to any facts at all.

We have had occasion, in several instances, to point out that a surveyor cannot be allowed, under any circumstances, to fix private rights or lines by any theory of his own. Before a surveyor's evidence can be received at all, it must be connected with the starting points and other places or lines called for by the grants under which the parties claim. His duty is neither more nor less than to measure geometrically in accordance with those *data*, and his science goes no further. It is not his business to decide questions of law, or to pass upon facts that belong to the tribunal dealing with the decision of facts. His testimony, as a man of science, is never receivable except in connection with the *data* from which he surveys, and if he runs lines they are of no value unless the *data* are established from which they are run, and those must be distinctly proven, or there is nothing to enable any one to judge what is the proper result.

The maps which plaintiff introduced did not give the *data* necessary to measure the rights of parties on any theory. They failed to identify the extent or bounds of the adjacent government subdivisions, or even those of the particular division in question. They gave no means of getting at just where the thread was supposed to be, or the shore conformation, except in a limited range, and were in other respects deficient. These defects were not made up by any other proofs in the case. The result arrived at in accordance with the surveyor's notions ·was practically an · absurd one, and destructive of the water-rights of a large coast-line southward and westward.

The maps and other testimony give no such means of adjustment as would authorize us to deal with the abstract questions presented, and we shall not attempt, with our present want of light, to do it. Neither would it be desirable to do so at all, in view of the clear proof,

not in any way controverted, that, as a matter of fact, the possession of defendant has been under an actual, defined occupancy very much longer than would cut off any theoretical rights to the contrary if they existed.

It appears that at least as early as between 20 and 30 years before suit a line of piles was driven which would exclude from plaintiff's occupancy all of the disputed territory. It appears, and is not disproved, that this was done for the purpose of fixing boundaries, and it was in itself such an act as would have been a trespass if wrongful, and it was the most unequivocal assertion that could well be made, when followed up by the use of the line as a boundary, of such active and business possession as can be had of land under water. As the testimony stood, we cannot see on what theory these undisputed facts could be avoided, and we think the court erred in not finding in accordance with them. It may further be remarked, although we do not base any decision upon it, that if the plat of the water-lots, and its conformity to the curvature of the bay, is regarded, the line of piles is at least in very close harmony with it.

There were errors assigned on the reception and rejection of testimony which we do not wish to be regarded as treating as unfounded, but which, in the state of the record, are not necessary to be noticed.

The judgment must be reversed, and a new trial ordered.

The other Justices concurred.