### ALEXANDER KANOUSE

*v.*

### MARIA SLOCKBOWER.

1. The title to the soil under the waters of lakes and ponds in this state passed to the proprietors, and not to the state, and is, therefore, subject to the same legal regulations that govern the acquisition, enjoyment and transmission of other real property.

2. The maxim, *"Falsa demonstratio non nocet,"* is without pertinency or utility, except in cases where two or more descriptions of the same thing are given in a grant or devise which are contradictory or inconsistent.

3. Whenever the testator's intention to give the whole, as an entirety, clearly appears from the language of the will, additional words of description which prove to be only partially true will be rejected as a misdescription; but it is not true that words of general description will always prevail over an enumeration of particulars; for, in cases where there is an enumeration of particulars which, on their face, purport to be designed as qualifications or restrictions of a preceding general description, there the general description must yield to the particular description.

4. A grant of land bounded upon or along a river, above tide-water, carries the title of the grantee to the centre of the stream, if the title of the grantor extends that far, unless the terms of the grant show that it was the intention of the parties that the grantee's title should not extend to that point.

5. But this rule does not apply to grants of land abutting upon fresh-water lakes and ponds; in such cases the grant extends only to low-water mark.

On final hearing on bill, answer and proofs taken orally.

*Mr. James H. Neighbour* and *Mr. Theodore Runyon,* for the complainant.

*Mr. John L. Conover* and *Mr. Alfred Mills,* for the defendant.

VAN FLEET, V. C.

This is a partition suit. The complainant, by his bill, asserts a title to a little over two-thirds of the land he asks to have divided. His exact fractional interest, as he states it, is eighty-

one one hundred and twentieths, and he says that other persons
hold the other thirty-nine one hundred and twentieths. The
defendant, Maria Slockbower, according to the complainant's
statement of the title, is entitled to ten one hundred and twen-
tieths, or one-twelfth. She, however, asserts a title to all the
land. She claims to own the whole in severalty. Temperance
Nolen is the common source of title; both parties attempt to
trace the title they respectively set up to her. The land in ques-
tion constitutes a part of what was Temperance Nolen's home-
stead farm. Eighty-three acres, in Jefferson township, Morris
county, were set off to her in 1807, on the partition of her
father's land, and the land in question is a part of this tract.
Temperance Nolen died testate in January, 1864. Her will
bears date June 12th, 1861. The land in controversy is covered
by the water of Lake Hopatcong, and was, prior to the date of
the will, when the water of the lake was in its ordinary state
and condition. The first gift made by the will is to the testa-
trix's son Abraham. The words of this gift, so far as they are
material to the questions to be hereafter discussed, are the fol-
lowing :

"I give and bequeath to my son Abraham the use and income of the south-
easterly part of my homestead farm, as hereafter described, that is to say:
beginning at the sixth corner of my homestead farm, thence running" &c.

The words, "beginning at the sixth corner of my homestead
farm," refer undoubtedly to the sixth corner of the eighty-three
acre tract as established by the survey by which that tract was
allotted to the testatrix. A plotting of the two tracts, which is
in evidence, shows conclusively that that is the sense in which
they were used. The land devised to Abraham is described by
course and distance and metes and bounds, and the only allusion
made to the lake in the description is found in the eleventh line,
which reads as follows: "north, twenty-four degrees west, three
chains and fifty-nine links to a corner of Beemer's land at the
edge of the pond." The second gift is to the children of testa-
trix's deceased son Nathan. The controlling words of this
gift are:

"I give and bequeath unto my son Nathan, now deceased, to his children the remainder of my homestead farm, *as hereafter described*, that is to say: beginning at a stake standing at the edge of the Great Pond, and in the third line of the whole tract, distant three chains and fifty links from the third corner of said tract; thence"

Then the different lines of the tract intended to be devised are described, by course, distance and monuments, until the line extending to the lake is reached, when the will, in describing the two last lines, says: " North, fifty-two degrees west, eleven chains to the edge of the pond; thence by the same the several courses thereof to the beginning."

The dispute between these parties grows out of the language in which this last devise is made, and the question, whether the complainant or the defendant shall prevail in this suit, depends entirely on the construction which the clause just epitomized shall receive. The single point in dispute is as to the extent or quantity of land which passed by the devise, the contention of the complainant being, that no land covered by the water of the lake, lying beyond or below low-water mark, passed, while the defendant's insistment is, that all the testatrix's homestead farm which she owned at the time of her death, and which did not pass by the devise to Abraham, passed to the children of Nathan. Since the death of Temperance Nolen, the complainant has procured conveyances from a part of her heirs at law, assuming that she died intestate as to the land he asks to have divided, while the defendant stands before the court as the successor in title to the land devised by the testatrix to the children of her son Nathan. It is thus seen that the question presented for decision is purely one of construction.

It is not disputed that the land in controversy, though covered by the water of Lake Hopatcong, is the subject of private property, as much so as land lying adjacent to the lake but untouched by its water. The title to the soil under the waters of the lakes and ponds in this state passed to the proprietors, and not to the state, and is therefore subject to the same legal regulations that govern the acquisition, enjoyment and transmission of other real property. This was so decided by the supreme court in *Cobb* v. *Davenport, 3 Vr. 369*, and is the settled law of this state.

This devise, as I read it, presents no ground whatever for the application of the maxim, *"Falsa demonstratio non nocet."* That maxim, as the language imports, is without pertinency or utility, except in cases where the testator has, in designating the thing which he means to make the subject of his gift, given two or more descriptions of it which are contradictory or inconsistent. A quotation from *Sheppard's Touchstone* will illustrate what is meant. It is there said:

"If one grant all his lands which he hath in D. in this manner—all my lands in D. which I had of the grant of I. S.—this is a good grant of all his lands in D., albeit he had them not of the grant of I. S., but of the grant of another. But if the words be, all my lands which I had by the grant of I. S. in D., in this case the grant is not good to carry any other lands in D. but such as he had of the grant of I. S. So if one grants in this manner, all my manor of sale, in Dale, which I had by descent, and in truth he had it not by descent but by purchase—this is a good grant of the manor." *Shep. Touch.* (*1st Am. ed.*) *247 marg.*

*Griscom* v. *Evens, 11 Vr. 402 ; S. C. on error, 13 Vr. 579,* also furnishes a very apposite illustration. The descriptive words in that case were:

"All that my farm and plantation near Cropwell, conveyed to me by the heirs of my deceased wife, and where my son, Thomas Evens, now resides, containing about eighty-five acres more or less."

The testator's farm near Cropwell, whereon his son Thomas resided, embraced in fact fourteen acres which had not been conveyed to him by the heirs of his wife, but had come to him from an entirely different source. Consequently the words, " conveyed to me by the heirs of my deceased wife," stood in direct incompatibility with two other descriptions of the lands intended to be devised, namely, " all that my farm near Cropwell " and "where" or whereon " my son Thomas now resides," so that a case was presented which compelled the court to decide whether the words, " conveyed to me by the heirs of my deceased wife," were a mere false description, or were used to restrict the generality of the language of both a previous and subsequent description. But here there is no conflict or incompatibility. The description of the thing intended to be given is single, simple and definite. The

descriptive words are, "the remainder of my said homestead, as hereinafter described, that is to say," and then follows a description as certain and definite as can be expressed in words. Not all or the whole of the remainder is given, but "the remainder as hereafter described;" that is, only so much of the remainder as lies within certain defined lines. The words, "the remainder" and "as hereafter described," stand in such relation to each other as to make it perfectly plain that they were used as parts of the same description. That is what they say plainly and without the least ambiguity. The defendant's construction proceeds, as I think, on an obviously false basis. It first attributes to the testatrix an intention to give the whole of the remainder of her homestead farm, and then says, that, inasmuch as the land subsequently particularly described is less in quantity than the whole area of the remainder, the last description of the subject of her gift stands in conflict with her first description of it. But this construction, as is manifest, ascribes to the testatrix an intention which she has not expressed. She has not said that she intended to give the remainder of her homestead farm, but what she did say was this: that she intended to give the remainder of her homestead farm as such remainder was particularly described, by course, distance and monuments, in her will. The thing she gave, to repeat the words of her will, is "the remainder of my homestead farm as hereafter described." And just here the query suggests itself, can the word "farm" be fairly held to describe land which is constantly under water, and for that reason incapable of cultivation?

But if we were to adopt the defendant's construction as the true one, and say that the descriptive words used in this devise are incongruous, still I think it is entirely clear, according to established principle, that that course would not, in the slightest degree, strengthen the defendant's claim. The words, "as hereafter described," together with the particular description immediately following them, render it conspicuously clear, as it seems to me, that those words and the specific description were used to restrict and limit the generality of the preceding phrase, "the remainder." When that is the case, the law is settled that the

·general description must yield to the particular description.   The
rule laid down on this subject by the supreme court, in *Griscom*
v. *Evens, 11 Vr. 402, 413,* is to this effect: Whenever the tes-
·tator's intention to give the whole, as an entirety, clearly appears
from the language of the will, whether such intention is ex-
pressed by a designation, by a name, or by abuttals, or other·
·descriptive words, additional words of description which prove
·to be only partially true will be rejected as a misdescription;
but it is not true that words of general description will always
prevail over an enumeration of particulars, for, in cases where
·there is an enumeration of particulars which, on their face, pur-
port to be designed as qualifications or restrictions of a preceding·
·general description, there the general description must yield to
the particular description.   This rule has its root in that great
principle which declares that, in construing wills, the court must,·
·if possible, give effect to every word of the will.   The chief-
justice, speaking on this subject in pronouncing the judgment of
·the court of errors and appeals, in the case last cited (*13 Vr. 579,
594*), said: that the cases, dealing with the ·question now under
·consideration, all teach this important lesson, that, in view of the
public interest, it is "no light thing to expunge from a will,
unless upon well-nigh incontestable grounds, any part of the
language of the testator.   To justify the suppression of a single
·descriptive term, such term must not only be out of exact har-
mony with other parts of the demonstration, but it must be un-
deniably so in some important respect, after putting a reasonable
·construction on the entire descriptive context, and the judicial
leaning should be to the retention of every word.   Unless this
·be the rule uniformly enforced, confusion will take the place of
legal regulation, for there are comparatively few testamentary
·descriptions, consisting of several items, in which all the parts so·
·exactly accord, that it is not possible for ingenuity to point to
·differences."   The contest here is between a person standing in
·the right of the heirs at law of the testatrix and a person claim-
·ing in the right of devisees under her will.   In such a contest,
·it is important to remember, that heirs have always been looked

upon with favor by courts of justice, and that the principle is well settled, that plain words are required to disinherit them.

. My conclusion on this branch of the case is, that only such part of the testatrix's homestead farm passed under the devise to her son Nathan's children as lies within the boundary lines particularly set forth in the devise.

The case presents another question, and that is, what is the true location of the western line of the land devised to the children of the testatrix's son Nathan? The land devised lies on the east shore of Lake Hopatcong, and the question is, how far it extends into the lake, either by the terms of the devise, or by force of legal construction? If we look at nothing but the boundaries set forth in the devise, it would seem to be perfectly clear that the testatrix meant to locate the western line of the land devised at the edge or margin of the lake, and to exclude all the land she owned lying west of such line. She fixed the beginning point of the tract she intended to devise at the edge of the lake, although she knew that the land allotted to her in 1807, and which subsequently became her homestead farm, extended north of that point, out into the lake, three chains and fifty links. This is shown by the language in which the beginning point is located. It reads thus:

" Beginning at a stake standing at the edge of the Great Pond, and in the third line of the whole tract, distant three chains and fifty links from the third corner of said tract."

This language proves conclusively that the testatrix was well acquainted, when she made her will, with the boundaries of the land set off to her in 1807, and also that she knew she was not devising to the children of her son Nathan all of the remainder of her homestead farm. That she meant to locate the western line of the land devised at the margin of the lake is made still more manifest by the language in which the last two lines are described. They are described as follows:

" North, fifty-two degrees west, eleven chains to the edge of the pond; thence, by the same [that is, by the edge of the pond,] the several courses thereof to the beginning."

The edge or margin of the lake is thus, by plain words, made the western boundary of the tract devised, and proof, inherent in the devise itself, shows conclusively that the testatrix established the western line of the tract devised at the edge of the lake with full knowledge that the line which she so established lay east of the western line of her homestead farm from two to fifteen chains. A testator has an undoubted right to prescribe such limits to his devise as he sees fit, and if he marks out, by clear words, the boundaries of the land he intends to give, the court can give the devisee nothing beyond such boundaries. His will is the law. The proofs are agreed that there has been no material change in the edge or shore-line of the lake for over thirty years, except when its water is drawn out to feed the Morris canal, but that the water of the lake stands now, when the lake is in its ordinary state and condition, at no greater or less height than it did when the will in question was made. This being so, it necessarily follows that the western line of the land devised is, by force of the terms of the devise itself, located at the edge or margin of the lake, unless land bounded by the margin of a lake, by mere force of construction of law, and without regard to the terms of the devise or grant, extends beyond such line.

The law is well settled that a grant of land bounded upon or along a river, above tide-water, carries the title of the grantee to the centre of the stream, if the title of the grantor extends that far, unless the terms of the grant show that it was the intention of the parties that the grantee's title should not extend to that point. But this doctrine has not, except in Massachusetts, been held to apply to grants of land abutting upon fresh-water lakes and ponds. In *Paine* v. *Woods*, decided by the supreme court of Massachusetts in 1871, the court said, speaking by Mr. Justice Gray: "The general rule of construction of all grants of land bounded *by water of any kind* is now well established, that, unless qualified by restrictive words, they pass the soil towards the centre of the water as far as the grantor owns." *108 Mass. 160, 169.* The reason this rule prevails in Massachusetts is because the law of that commonwealth, from a period reaching back to colonial times, has placed fresh-water lakes and ponds

on substantially the same footing as tide-waters. The title to the soil under them is in the state, and is not the subject of private property unless made so by legislative grant, and their waters are open and common to all the public for fishing, fowling and other uses. *West Roxbury* v. *Stoddard, 7 Allen 158, 108 Mass. 160, 169.* The doctrine prevailing elsewhere is stated by Angell in his treatise on the *Law of Watercourses,* as follows (§ *41*):

"When land is conveyed bounding upon a lake or pond, if it is a natural pond, the grant extends only to the water's edge; but if it is an artificial pond, like a mill-pond caused by the flowing back of the water of a river, the grant extends to the middle of the stream in its natural state."

Gould, in his *Law of Waters* (§ *203*), states the rule in substantially the same way, except he says that the grant extends to low-water mark instead of to the water's edge. And Mr. Justice Hoar, in *West Roxbury* v. *Stoddard, 7 Allen 158, 167,* said: "The rules of law which apply to questions of boundary on rivers have never been considered applicable to the great lakes or fresh-water ponds. The boundary on a natural pond extends only to low-water mark." The rule, as thus stated, is supported by many adjudications, a few of which only will be cited. *Wheeler* v. *Spinola, 54 N. Y. 377, 385; Waterman* v. *Johnson, 13 Pick. 261, 265; Bradley* v. *Rice, 13 Me. 198, 201, 202; State* v. *Gilmanton, 9 N. H. 461, 463; Champlain and St. Lawrence R. R. Co.* v. *Valentine, 19 Barb. 484, 492.*

My conclusion is, that it must be held, both according to the terms of the devise and construction of law, that the true location of the western line of the land devised by the testatrix to the children of her son Nathan, is at low-water mark, when the lake is in its ordinary state and condition, and that as to all the land lying west of such line, of which the testatrix died seized, she died intestate, and that, on her death, it passed to her heirs at law.