WELDER et al. v. STATE.    (No. 5677.)*

(Court of Civil Appeals of Texas. Austin. May 30, 1917. On Motion for Rehearing, June 27, 1917.)

1. NAVIGABLE WATERS ⬤�netext36(2)—OWNERSHIP OF BED—GRANT.

If the owners of land riparian to a navigable lake own the bed of the lake, it is because the land was specifically granted, since land cannot be appurtenant to land.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–183, 185, 187, 196.]

2. COMMON LAW ⬤⟋11—EFFECT—STATUTES.

Common law, as modified by local conditions, is in force in Texas.

[Ed. Note.—For other cases, see Common Law, Cent. Dig. §§ 9, 12.]

3. WATERS AND WATER COURSES ⬤⟋34—STATUTES GOVERNING.

The common law as to nonnavigable streams is the rule of decision in Texas.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 27, 28.]

4. BOUNDARIES ⬤⟋3(9)—CONTROL—QUANTITY.

While excess in quantity will be disregarded where the boundaries of a survey can be otherwise ascertained with reasonable certainty, yet, in the absence of such ascertainment, quantity may be looked to in determining the boundaries.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 41.]

5. WATERS AND WATER COURSES ⬤⟋89 — GRANTS OF PUBLIC LANDS—PRESUMPTIONS—SHORE OF LAKE.

Though the grantee may hold an excess by reason of the calls in his grant for natural or artificial objects to which his line will be extended, it was never the intention of the state to grant an excess in any survey, and therefore where a line calls for the shore of a lake it will not be extended a mile to reach the center of the lake.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 91, 92, 107.]

6. WATERS AND WATER COURSES ⬤⟋89—NAVIGABLE WATERS—CONTROL OF CAUSE.

The common-law doctrine of extending the call for a nonnavigable stream to the center thereof does not apply to calls for a navigable lake as a boundary.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 91, 92, 107.]

7. BOUNDARIES ⬤⟋1—CONTROL OF CALLS — INTENTION OF PARTIES.

The controlling issue in all boundary suits is the intention of the parties.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 1.]

8. BOUNDARIES ⬤⟋33—CONTROL OF CALLS—QUANTITY.

Where a grant of public lands called for a given number of acres, the presumption is that the government did not intend to grant more, and the lines would not be extended to include approximately a 40 per cent. greater acreage.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 146–152.]

9. BOUNDARIES ⬤⟋9 — CONTROL OF CALLS — QUANTITY.

Grants conveying a given number of acres and stating the amount of arable and of pasture lands in each will not be extended to embrace the area of a lake bed which is neither arable nor pasture land.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 77–89.]

10. NAVIGABLE WATERS ⬤⟋37(4)—GRANTS OF LANDS—BED OF LAKE—PRESUMPTIONS.

Where Vernon's Sayles' Ann. Civ. St. 1914, art. 5338, required that all surveys on navigable waters should front one-half of the square thereon, and run back at right angles, and surveys upon a lake were so made, it was evidently regarded as a navigable lake, so that its bed would not be included in the grants.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 211, 218–222.]

11. WATERS AND WATER COURSES ⬤⟋89—CONTROL OF CALLS.

A call for the margin, edge of water, high or low water mark, or shore or bank of a lake excludes the bed thereof.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 91, 92, 107.]

12. NAVIGABLE WATERS ⬤⟋1(3)—HOW DETERMINED — CAPACITY — "NAVIGABLE WATERS."

Whether waters are navigable is to be determined by their capacity and not by the particular use at the time of inquiry and a lake averaging four feet in depth from which fish are taken and which is capable of use for floating logs or light draft boats is navigable.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 7.]

13. NAVIGABLE WATERS ⬤⟋37(2) — SALE BY STATE—POWER TO SELL.

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 3980, a navigable lake cannot be sold, but under article 4921b is under the jurisdiction of the game, fish, and oyster commissioner.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 203.]

Appeal from District Court, Travis County; Chas. A. Wilcox, Judge.

Suit by the State against John J. Welder and others. Judgment for plaintiff, and defendants appeal. Affirmed. On motion for rehearing. Motion overruled.

Batts & Brooks, of Austin, and Proctor, Vandenberge, Crain & Mitchell, of Victoria, for appellants. B. F. Looney, Atty. Gen., G. B. Smedley, Asst. Atty. Gen., and Elmer Yates, of Edinburg, for appellee.

## Findings of Fact.

JENKINS, J. The state of Texas sued the appellants in trespass to try title to recover 5,823 acres of land described by metes and bounds, and alleged to constitute the bed of Green Lake in Calhoun county, Tex. Two sets of field notes were introduced in evidence, one made in July, 1913, when the lake was dry, embracing 4,927 acres, in which the margin of the lake was run as called for in the field notes of the surrounding surveys; the other made by the same surveyor in November, 1913, when the lake was full, and which was run along the water's edge, and embraced 5,823 acres. The difference was occasioned by the erosion of the water on the northeast side of the lake.

The case was tried before the court without a jury, and the court gave judgment for the state upon the field notes of the survey made when the lake was dry. In other words, the state recovered all of the bed of the lake not included in the field notes of the

surrounding surveys when run out according to their calls for course and distance. Green Lake is oval in form, and is about 3½ miles long by about 2 miles wide. It is entirely surrounded by patented surveys, as shown by the following sketch from the official map of Calhoun county:

The court filed the following statement of facts:

"I. Green Lake, the subject of controversy in this case, is an inland fresh water lake, situated in Calhoun county, Tex., about 2½ miles from Guadalupe river, and is situated in the valley of the Guadalupe river, the eastern portion of said lake bordering upon the foothills which mark the beginning of the upland. The lake is shallow at the margin, gradually becoming deeper for a distance of a few hundred feet where it attains its maximum depth, the remainder of the bottom of the lake being practically level and the water being of an average depth at the ordinary water stage of about 4 feet. On occasions of any considerable overflow of the Guadalupe river (which occur not infrequently) the lake is filled by the flood waters of the river, and this is the main source of the renewal of its waters. During times of large overflows the whole valley of the river to the foothills, including the lake and all of the surrounding country, is submerged. The lake contains approximately 6,000 acres of land, and is about 13 miles in circumference.

"II. Green Lake has been used and is valuable principally as a watering place of stock belonging to the owners of the surrounding lands.

However, fish in considerable quantities have been taken from it and sold, and boats have been operated upon it for the purpose of taking fish; and the lake is of some value as a fishing preserve.

"III. Considering not only the size of the lake and the depth of its water, but also the variableness of the depth of the water, the nature of the surrounding country, its frequent overflows, and all the circumstances of the case, it is not probable that it will ever be of any public value as a highway of commerce.

"IV. All of the lands surrounding the lake are now owned by the defendants, but were originally granted in small parcels to different persons and at different times, reference being here made to the title papers evidencing such grants, which were introduced in evidence in this case, for the description of the land granted and for such other facts with reference thereto as may be material.

"V. I find that each of the grants of land surrounding said lake contained the full number of acres called for in such grants without including therein any portion of the bed of said lake; and that to hold that such grants include the bed of the lake would have the effect of nearly doubling the quantity of land called for in the grants.

"VI. All the defendants except Winn T. Harvey, who has disclaimed, are claiming the title to the lands under the waters of said lake by virtue of the ownership of the grants surrounding it.

"I find that the survey made by Helmbeck in the year 1913, when the lake was dry, represents approximately the line to which the grants surrounding the lake extends when constructed according to their calls, and this line has been adopted as the true boundary line of those portions of the survey bordering upon the lake."

And at the request of appellee the court made the following additional findings of fact:

"I find that the land around Green Lake has always been, for the most part, grazing land, and has always been and is now thinly settled, and that there has been no trade in said vicinity sufficient to warrant any considerable use of Green Lake for commercial purposes other than fishing and other than the hauling of wood, as testified by the witness Henry Jordan. I find that in the year 1861 Henry Jordan built a sailboat 20 feet long with two masts and drawing 2 feet of water when carrying three cords of wood, and that he used the same for a considerable time in carrying firewood across the lake for a man named Fleming, who lived near the lake, and that during the same time the land was used by light skiffs and boats for hunting and fishing. I further find that from the year 1900 to the year 1912, the witness W. T. Harvey made a business of fishing on Green Lake and realized from $50 to $100 a month from the sale of fish that he caught in the lake; that in fishing he used a sailboat 20 feet long and a motorboat 18 feet long, both drawing from 18 to 24 inches of water; and that he had from 40 to 50 people fishing for him with seines on the lake at one time; that at said time the lake was almost dry and the fish, by reason of reduced area and depth of the water were concentrated and caught in greater quantities than at any other time; and that while Harvey had said boats on the lakes other persons had small sail and motor boats on the lake to the number shown by the statement of facts which they used for fishing. I find that in its ordinary condition Green Lake, having a depth of 4 feet over the greater part of the lake, is susceptible of use for fishing, pleasure, and commercial boats, provided the boats are of light draft."

The findings of fact are sustained by the evidence, and we adopt them as our own.

These surveys were originally owned by the parties to whom the certificates, by virtue of which said surveys were made, were issued or to their assignees, but at the time of the trial they were all owned by the appellants herein.

### Opinion.

[1] The issue in this case is not whether the state could grant title to land in the bed of a natural, permanent fresh water lake, but has it done so as to Green Lake? If so it is solely by reason of the fact that it has granted all of the land contiguous to and bordering upon said lake, and not by reason of any description in the grant which otherwise covers the bed of the lake. Neither is it a question of appurtenance, or riparian rights. If the appellants are the owners of the land covered by Green Lake, it is because such land has been granted to them, and not because it is appurtenant to land which they own. Land cannot be appurtenant to land. As to riparian rights, the judgment of the trial court expressly reserves such rights to appellants. The appellants plant themselves upon the doctrine of the common law —that a conveyance of land on a nonnavigable stream conveys title to the center of such stream, their contention being that the common law in this regard is modified by statute in this state only to the extent of declaring streams 30 feet wide or over to be navigable.

[2] It is true that the common law as modified by our local conditions is in force in Texas. But the common law, as has been aptly said, is a system of principles, and not a collection of arbitrary rules. The common law claims to be the perfection of reason, and it is one of its maxims that where the reason ceases the law ceases; or, as applied to this country, it may be said that where the reason never existed the law never existed. The reason why no streams were classed as navigable in England, except those in which the tide ebbed and flowed, was that no others in that country were navigable in fact. But it is absurd to apply this test to such rivers as the Mississippi, the Missouri, and the Ohio.

Mr. Justice Brown, in Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011, said:

"The effect of the act of 1840 was not to * * * put into effect the body of the common law, but to make effective the provisions of the common law so far as they are not inconsistent with the conditions * * * of our people."

Mr. Chief Justice Gaines, in Land Co. v. McClelland, 86 Tex. 185, 23 S. W. 576, 1100, 22 L. R. A. 105, declared that the common law as to inclosing lands was not applicable to conditions in this state. In Swayne v. Oil Co., 98 Tex. 605, 86 S. W. 742, 69 L. R. A. 986, 8 Ann. Cas. 1117, the same learned Judge, speaking for the court, said:

"So in other instances rules established in England were not regarded as of controlling authority in this state, for the reason that it was thought that the conditions here were so different from those existing in England that if the conditions in that country had been the same as in this, the ruling there would have been different."

In Railway Co. v. Smith, 72 Miss. 683, 17 South. 80, 27 L. R. A. 764, 48 Am. St. Rep. 579, the Supreme Court of Mississippi said:

"It is a mistake to assume that the common law of England, though adopted and accepted as the law of the state, and though unchanged by statute, is under all circumstances and conditions to be applied as the local common law"— citing Vicksburg Co. v. Patton, 31 Miss. 156, 66 Am. Dec. 552, Green v. Weller, 32 Miss. 650, Crane v. French, 38 Miss. 503, and Sinai v. Railroad Co., 71 Miss. 547, 14 South. 87.

See, also, 5 R. C. L. p. 809.

[3] The common law as to nonnavigable streams is the rule of decision in this state. Dutton v. Vierling, 152 S. W. 450; Rhodes v. Whitehead, 27 Tex. 304, 84 Am. Dec. 631; Landa v. Muller, 31 Tex. 265. Also as to roads, streets, and alleys: Mitchell v. Bass, 26 Tex. 372; Bond v. Railway Co., 15 Tex. Civ. App. 281, 39 S. W. 978; Cocke v. Railway Co., 46 Tex. Civ. App. 363, 103 S. W. 407. In the language of a modern advertisement, "there is a reason" which applies to such cases in this state with equal force as in England.

[4] The area of nonnavigable streams (streams less than 30 feet wide under our statute) is small and is valueless except to the owner of the adjoining land, and it is therefore a reasonable presumption that the owner of such streams, in conveying the land upon each side thereof, did not intend to reserve the narrow strip of land in the bed of the creek. Dutton v. Vierling, supra. The same reason applies to roads, streets, and alleys. The land in front of a survey bordering on a large lake is not inconsiderable, but in many instances would exceed the area called for in the survey. While excess in quantity will be disregarded where the boundaries of a survey can be otherwise ascertained with reasonable certainty, yet, in the absence of such ascertainment, quantity may be looked to in determining the boundaries. Scott v. Pettigrew, 72 Tex. 328, 12 S. W. 161. In Indiana v. Milk (C. C.) 11 Fed. 389, the court said:

"I do not think the mere proprietorship of the surrounding lands will, in all cases, give ownership to the beds of natural nonnavigable lakes and ponds, regardless of their size. It would be unfair and unjust to allow a party to claim and hold against his grantor the bed of a lake containing thousands of acres, solely on the ground that he had bought and paid for the small surrounding fractional tracts—the mere rim."

In Hodges v. Williams, 95 N. C. 331, 59 Am. Rep. 242, the court, after stating the doctrine in reference to nonnavigable streams, said:

"We find no case where this principle has been applied to large bodies of water like this lake."

In the instant case the acreage called for by the surrounding surveys aggregate about 13,000 acres, and the area of the lake is nearly 5,000 acres. But if it be assumed that Green Lake is a nonnavigable body of water, and that for this reason it is included in the surrounding surveys, the result would be the same if it contained 13,000 acres or more, and the surrounding surveys called for 5,000 acres, or less.

[5] All land in this state was originally granted by the state by virtue of certificates or pre-emption surveys, by virtue of which the grantee was entitled to a given number of acres and no more, and the law contemplated that such surveys should be actually made upon the ground. Though the grantee may hold an excess by reason of the calls in his grant for natural or artificial objects to which his line will be extended, it was never the intention of the state to grant an excess in any survey. The exception in the case of creeks, where it is not practicable to extend the line, is de minimis. In the instant case, if the lines calling to run a certain distance to the lake required extensions in order to reach the lake, such extensions would be made, upon the theory that the surveyor made a mistake in measuring such lines, but this is quite a different proposition from extending a line a mile or more in order to reach a point in the center of a lake, when the call is for a point on the lake. Does the common-law doctrine as to a nonnavigable stream apply in England also to lakes? We have been referred to no case which so holds, and we do not know of any such. Bristow v. Cormican, L. R. 3 App. Cases 641, cited in Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 35 L. Ed. 428, is not authority upon this point. It did not involve the question of boundary or of riparian rights, but only the validity of plaintiff's title to Lough Neagh, a large lake in Ireland, under an alleged grant from Charles II, and, as stated by Lord Blackburn:

"It was perfectly clear that the plaintiff in ejectment could recover only on the strength of his own title."

To show that it was not held in Bristow v. Cormican that the owner of land bordering upon a lake owns the bed of the lake in front of his land, we quote from the decision in that case as follows:

"Whether the rule that each adjoining proprietor, where there are several, is entitled usque ad filum aquæ should apply to a lake is a different question. It does not seem very convenient that the proprietor of a few acres fronting on Lough Neagh should have a piece of the soil of the lough many miles in length tacked onto his frontage. But no question arises in this case as to the rights of the riparian proprietors among themselves, for no title is made by either party through any one as riparian owner."

In Marshall v. Ulleswater, 3 Best & S. p. 741, decided in Q. B. 1862, the court said:

"Whether the soil of lakes, like that of fresh water rivers, prima facie belongs to the owners of the land or, of the manors on either side, ad medium filum aquæ, it is not necessary in this case to determine."

In Bloomfield v. Johnson, 8 C. L. 68, it was held that the grant of land bordering on a lake did not carry title to any portion of the lakebed. The court said:

"The law as to riparian ownership of the banks of a river or stream flowing between adjoining proprietors cannot here dispense with a grant of the land covered with water. * * * I am not prepared to extend the presumption that the bed and soil of a stream belongs to the riparian proprietors ad medium filum aquæ, to a large inland lake like Lough Erner."

This question has given rise to considerable litigation in the different states of the Union, though this appears to be the first of its kind in this state. As said in Lembeck v. Nye, 47 Ohio, St. at 336, 24 N. E. 689, 8 L. R. A. 581, 21 Am. St. Rep. 828:

"The authorities * * * are in [hopeless] conflict, and seem to be incapable of reconciliation."

The contention of appellants is supported by the decisions of Arkansas (Glasscock v. Box Co., 104 Ark. 154, 148 S. W. 248), Minnesota (Scheifert v. Briegel, 90 Minn. 125, 96 N. W. 44, 63 L. R. A. 296, 101 Am. St. Rep. 399; Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541), Michigan (Jones v. Lee, 77 Mich. 35, 43 N. W. 855), Utah (Poynter v. Chipman, 8 Utah, 442, 32 Pac. 690), and Ohio (Lembeck v. Nye, 47 Ohio St. 336, 24 N. E. 686, 8 L. R. A. 578, 21 Am. St. Rep. 828).

The Supreme Court of New York in Gouverneur v. Ice Co., 134 N. Y. 355, 31 N. E. 865, 18 L. R. A. 695, 30 Am. St. Rep. 669, after citing a number of cases in which it was held that the common-law doctrine as to nonnavigable streams did not apply to large lakes, held that it did apply to "small nonnavigable lakes." In that case the lake contained about 45 acres. It had formerly been owned by the Fowlers, who had conveyed all the land surrounding it. On the other hand, the contrary doctrine is held in Illinois (Fuller v. Shedd, 161 Ill. 462, 44 N. E. 286, 33 L. R. A. 146, 52 Am. St. Rep. 380), Indiana (Brophy v. Richeson, 137 Ind. 114, 36 N. E. 424), Iowa (Noyes v. Collins, 92 Iowa, 566, 61 N. W. 250, 26 L. R. A. 609, 54 Am. St. Rep. 571), Massachusetts (Paine v. Woods, 108 Mass. 160), Maine (Stevens v. King, 76 Me. 197, 49 Am. Rep. 609), North Carolina (Hodges v. Williams, 95 N. C. 331, 59 Am. Rep. 242), New Hampshire (Mfg. Co. v. Robertson, 66 N. H. 1, 25 Atl. 718, 18 L. R. A. 679), New Jersey (Kanouse v. Slockbower, 48 N. J. Eq. 42, 21 Atl. 197), Vermont (Fletcher v. Phelps, 28 Vt. 257), and Wisconsin (Pewaukee v. Savoy, 103 Wis. 271, 79 N. W. 436, 50 L. R. A. 836, 74 Am. St. Rep. 859).

[6] Without regard to their numerical strength, we think the decisions which hold that the common-law doctrine of extending the call for a nonnavigable stream to the center thereof does not apply to calls for a lake as a boundary, are supported by the bet-

ter reason. One reason for the conclusion which we have reached in this matter is the practical impossibility of partitioning a lake in accordance with this doctrine. For illustration: If a lake was a mile square and one survey was located upon each of its sides, with a frontage of one mile, the surveys upon the north and upon the south being extended to the center of the lake would embrace all of the land in its bed. Likewise, the surveys upon the east and upon the west would embrace all of such land. The difficulty is not lessened if the lake is oval with irregular shores, as will readily be seen by attempting such extension of the surveys surrounding Green Lake as delineated on the sketch appearing in our findings of fact, supra. It has been suggested that an equitable partition of the lake might be made, but upon what theory will equity deprive one of his legal title to a portion of his land, which he does not hold in trust. The suggestion of an equitable partition is a recognition of the fact that the owner of land fronting on a lake is not the legal owner of the land in front of his survey to the center of the lake.

[7] The controlling issue in all boundary suits is the intention of the parties to the grant as evidenced by its calls read in the light of the surrounding circumstances. We think that the learned trial court was correct in the following conclusion of law filed herein:

"I conclude that the calls of the respective surveys surrounding the lake do not indicate an intention to embrace the waters of the lake, but, on the contrary, indicate an intention to exclude the same."

[8] Practically all cases construing the calls for a creek, road, street, or alley, to extend to the center thereof, state that an exception to this rule is where it appears that such creek, street, or alley was meant to be excluded from the conveyance. That such appears to have been the intention in the instant case we deduce from the following facts:

(a) The surveys were made by virtue of certificates calling for a definite number of acres, and the presumption is that the government did not intend to grant more. If the surveys be construed to cover the lake, the aggregate acreage will be increased from about 13,000 acres to about 18,000 acres. Each of said surveys has its full acreage if the lake be excluded.

[9] (b) The Venites and the Lopez surveys state, as was then required by law, the amount of arable and the amount of pasture land in each. The bed of the lake is neither arable nor pasture land.

[10] (c) The law of this state required that all surveys on navigable water courses should front one-half of the square on such water course, and run back at right angles with the general course thereof, if previous surveys permitted. R. S. art. 5338. The surveys fronting on Green Lake conformed to this ar-

ticle, which shows that both the state and the owners of such surveys regarded the lake as navigable water. If so, it must be presumed that it was not intended to include any part of same in said surveys, even though it may not have been navigable in fact or within the meaning of the common law, or of the laws of this state.

[11] (d) A call for the margin, edge of water, high or low watermark, or shore or bank of a lake excludes the bed thereof. In Hardin v. Jordan, 140 U. S. 371, 391, 11 Sup. Ct. 808, 815, 35 L. Ed. 428, 436, cited by appellants, the court said:

"If the margin is named as the boundary the case is different; the land under the water being expressly excluded."

In Lembeck v. Nye, 47 Ohio St. 351, 24 N. E. 689, 8 L. R. A. 582, 21 Am. St. Rep. 828, cited by appellants, the court said:

"'Margin of the lake' is a term of unequivocal import, meaning the line where the earth and water meet around the lake; by the use of these words the parties have declared their intention to make, not the middle, but another part, of the lake—the edge of the water—the boundary line"—citing McCullock v. Aten, 2 Ohio, 308; Lamb v. Rickets, 11 Ohio, 311; Hopkins v. Kent, 9 Ohio, 13; Gould on Waters, § 199.

As to a call for "bank," see Kingman v. Sparrow, 12 Barb. (N. Y.) 201; Hatch v. Dwight, 17 Mass. 289, 9 Am. Dec. 145; People v. Supervisors, 125 Ill. 9, 17 N. E. 147. As to "edge," see Kanouse v. Slockbower, 48 N J. Eq. 42, 21 Atl. 197. As to "low-water mark," see Brophy v. Richeson, 137 Ind. 114, 36 N. E. 424. As to "high-water mark," see Cook v. McClure, 58 N. Y. 437, 17 Am. Rep. 270. As to "shore," see Axline v. Shaw, 35 Fla. 305, 17 South. 411, 28 L. R. A. 391, and Gouverneur v. Ice Co., 134 N. Y. 355, 31 N. E. 865, 18 L. R. A. 701, 30 Am. St. Rep. 669, wherein it is said:

"A boundary line * * * 'along the shore' of a fresh water stream, does not extend the grant to its center (Child v. Storr, 4 Hill [N. Y.] 369), and a like construction is applicable to a boundary by the bank of such a stream (Starr v. Child, 5 Denio [N. Y.] 599; Halsey v. McCormick, 13 N. Y. 296). In those cases the prescribed limitation of the boundary lines to the shore and bank did not permit the extension of the grant by construction to the thread of the stream."

In the instant case the field notes of the Venites, Lopez, Doyle, Bonney, and I. & G. N. Ry. Co. No. 3 call for corners on the margin of the lake, the Pollon calls for the bank, the Timmons and Belfour call for the shore, and the I. & G. N. No. 4 calls for the edge of the lake. The Venites calls also for the bank, and the Doyle, Bonney, and I. & G. N. No. 3 call also for the edge of the lake. The meanders of the shore of the lake are called for by course and distance, which are found to correspond with the shore of the lake as it now exists, except where the waters have eaten into the bank slightly next to the bluff on the east side. Some of the bearing trees called for on the margin of the lake were found and identified. We think

the judgment in this case should be affirmed upon another ground which the trial court refused to find as a fact or conclusion of law, viz. that Green lake is a navigable body of water, and upon which refusal of the court so to find the appellee has filed a cross-assignment of error.

[12] The old common-law idea of navigable waters were those used as highways of commerce, and hence no commerce being carried on fresh water inland streams in England, such streams being small and shallow, only the sea and tidal waters connected therewith were regarded by the common law as navigable. But, as the entire internal commerce in this country, prior to the building of railroads, was carried on our large rivers and great lakes, the tide water test was found not applicable to our conditions, and another test was applied, viz. navigability in fact. This test is not to be applied as of use made of a stream or lake at the particular time of inquiry, but as to its capacity for use, and the possible demands which may be made by the future settlement of the country. Jones v. Johnson, 6 Tex. Civ. App. 262, 25 S. W. 651; Lumber Co. v. Thompson, 113 S. W. 564; State v. Land Co., 127 Tenn. 575, 158 S. W. 748, Ann. Cas. 1914B, 1043.

Green lake having an average of 4 feet in depth, it had sufficient capacity to float boats large enough to carry extensive commerce. It was shown in State v. Land Co., supra, that a five-ton vessel 59 feet 2 inches long, and 15 feet 9 inches wide drew about 12 inches of water loaded, and that steamers 65 to 100 feet in length, and from 15 to 20 feet in breadth, draw from 15 to 24 inches of water loaded.

Behind all definitions of navigable waters lies the idea of public utility. Waters, which in their natural state are useful to the public for a considerable portion of the year are navigable. Boats are mentioned in the decisions because boats are the usual means by which waters are utilized by the public, and commerce is usually mentioned because carrying produce and merchandise is the usual public demand for such waters. But floating logs has frequently been held to be navigation, and hunting and fishing, and even pleasure boating, has been held to be proper public uses. State v. Land Co., supra, 127 Tenn. 575, 158 S. W. 750; Heyward v. Mining Co., 42 S. C. 138, 19 S. E. 963, 28 L. R. A. 42, 50, 46 Am. St. Rep. 702.

Why should not fishing be a proper public use? In England fishing has been an important industry from earliest times, and has been the subject of much litigation. In this state in the days of free land and free grass, when every one fished wherever he pleased, but little thought was given to the distinction between private and public waters. But fish are capable of being made an important source of food supply, and lakes capable of becoming an abundant source of such sup-

ply ought not be decreed to have been granted to private individuals merely as an incident to land upon the shores of such lakes. Rather, we think it ought to be presumed, in the absence of proof to the contrary, that the state, as trustee for the people, meant to reserve such lakes for the use of the public. It was shown by the evidence that for many years boats have been used on Green Lake for fishing purposes, and that without asking the consent of the owners of the surrounding land. One witness testified:

"I believe that more than $100,000 worth of fish have been caught in this lake in the last 15 or 20 years."

Under the policy which has recently been inaugurated in this state of stocking streams and lakes with fish, the supply may reasonably be expected to greatly increase in the near future. We deem the following quotation from Fuller v. Shedd, 161 Ill. 462, 44 N. E. 286, 33 L. R. A. 146, 52 Am. St. Rep. 380, pertinent to the facts of this case:

"The policy of the state of recent years has been to stock its waters, both streams and lakes, with fish, as a means of giving cheap and valuable food to her citizens and with this purpose regular appropriations and expenditures are made. If we depart from the reasonable rule we have established, the small nonnavigable lakes will become the private waters of riparian owners, pertinent to their lands, with the exclusive rights thereon as to boating, fishing and the like, from which the body of the people would be excluded—a principle inconsistent with and not suited to the condition of our people or called for as a rule of law."

The "reasonable rule" referred to is that the law as to extending calls for nonnavigable streams to the center thereof does not apply to lakes, a rule which we approve, but we also think it a reasonable rule that lakes large enough to be useful to the public for boating and fishing should be held to be public and not private property.

[13] Under the law as it now exists in this state, Green Lake cannot be sold (R. S. art. 3980), but is under the jurisdiction of the game, fish, and oyster commissioner (article 4021b).

For the reasons stated, the judgment of the trial court is affirmed.

### On Motion for Rehearing.

Appellants in their motion for a rehearing assert that we overruled the findings of fact made by the trial court as to the navigability of Green Lake. In this appellants are mistaken. The trial court found certain facts as to the size and depth of the lake, and the purposes for which it had been and probably would be used, and from these facts deduced as a matter of law that Green Lake was not navigable. We accept these facts and deduce the opposite legal conclusion. However, as appears from our opinion herein, we would have affirmed the judgment of the trial court upon other grounds without reference to whether or not Green Lake is navigable.

Motion overruled.