GEORGE SCHEIFERT and Others v. JOHN BRIEGEL and Others.[1]

July 3, 1903.

Nos. 13,395, 13,396, 13,397—(104, 105, 106).

**Riparian Owners.**

Riparian owners of a nonnavigable lake, the waters of which have dis-appeared, own that portion of the lake bed inclosed by extending lines from the points where the side division lines of each respective tract cross the meandered line to the center of the lake.

**Broken Shore Line.**

When such lake is of irregular shape, and originally contained no inlet or outlet, the inequalities caused by the broken shore line should be equitably adjusted between the contiguous owners by disregarding such irregularities, or by treating the lake as composed of separate bodies of water, according to the conditions.

**Division of Lake Bed.**

Where such lake bed slopes to the center, and the shore line is broken and irregular, it is not a proper method of division to establish central points and central lines in different portions of the lake, and extend the side lines of the different riparian divisions to such central points and central lines approximately dividing the land according to the lake frontage of each tract. Such division is not equitable, and not according to law.

Action in the district court for Sibley county to determine the boundary lines of the parties, riparian owners, and their respective ownerships of the bed of a lake, originally meandered and since become dry. The case was tried before Cadwell, J., who determined the boundary lines in the manner set forth in the opinion. From an order denying their separate motions for a new trial, plaintiff Joseph Hirschman and defendants Swan Rydeen and John Briegel severally appealed. Reversed, and new trial granted.

[1] Reported in 96 N. W. 44.

The plats referred to in the opinion follow:

Figure I

Figure 2

Geo. A. McKenzie and W. H. Leeman, for appellant Hirschman.
John Lind and A. Ueland, for appellant Rydeen.
Albert L. Young, for respondent Briegel.

LEWIS, J.

Swan Lake, in Sibley county, meandered and nonnavigable, originally contained several hundred acres, occupying portions of sections 17, 18, 19, and 20, township 112, range 31. For a great many years it has been gradually drying up, and at the time of the commencement of this action was practically dry land, and the various shore owners commenced this proceeding for the purpose of partitioning the bed of

the lake. The trial court divided the land in accordance with the plat, Figure 1, and for the purpose of division established three central points, C, D, and E, connecting them by center lines, marked upon the plat, 1 C. L., 2 C. L., and 3 C. L. Having established these center points and center lines, the court divided the land among the several owners by extending the side lines of the several tracts from the point where they crossed the meander line to points C, D, and E, and to points on the center lines as indicated by the plat. Certain of the property owners complain of the result upon the ground that the division is unequal. Some of them contend for the rule that the dividing lines should radiate to the center of the lake; others insist that it is not practicable to establish a center for division in a lake of this character, but that it was proper to adopt center lines. The latter, however, are not satisfied with the center lines established by the trial court, but suggest certain modifications, and propose that, with proper center lines established, the side division lines of the several fractions be extended at right angles to the center lines.

The question presented, then, is, what is the proper method of dividing the bed of the lake under such circumstances?

In Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, it was stated that shore owners take to the center of the lake, but in that case there was under consideration merely the question whether the shore owner was entitled to that portion of the land exposed between the meander line and the water, which had perceptibly receded, as against a patentee of the land from the United States government, and the question as to what should constitute the center of the lake, and when that method should be varied or strictly applied, was not before the court.

In Shell v. Matteson, 81 Minn. 38, 83 N. W. 491, the only question involved was the constitutionality of Laws 1897, p. 478 (c. 257), and that act was held unconstitutional upon the ground that the riparian owners held title to the center of the lake.

In Hanson v. Rice, 88 Minn. 273, 92 N. W. 982, the inquiry was whether or not one of the owners should be restricted to the full government subdivision in which the fraction of his land was located, and be cut off from the lake by extending the land of an adjoining shore owner. In the discussion of that question, in which the court declined to follow the Wisconsin rule, it was said that each owner was entitled

to the land between the shore and the center of the lake. But in that case the meander line as drawn by the government survey was incorrect, and the dispute was in dividing up the land between the meander line and the lake proper.

The rule has long been established that riparian owners upon a stream take to the center of the current. Schurmeier v. St. Paul & Pac. R. Co., 10 Minn. 59 (82); Olson v. Thorndike, 76 Minn. 399, 71 N. W. 399. But we have no knowledge of any attempt to apply this rule to lakes, where there is no inlet or outlet. It would seem reasonable that where a lake is long, and comparatively narrow, it may be treated as a river, and a center line established from one end of the lake to the other, which should be considered the thread of the stream. Such rule could also, for the same reason, be adopted in case of irregularly shaped lakes, where there had been an inlet and outlet, and through which there might have been either a real or theoretical current, which would be deemed to be the center line. In such cases the various owners may be said to have purchased their property with a view to the original situation.

In the case before us the evidence does not disclose whether originally, or in times of high water, there was an inlet and an outlet to the lake, nor does it appear whether there is a gradual slope towards the center on all sides of the lake. The theory upon which the court proceeded was that the method adopted accomplished a more equable division among the various owners than any other system, but the manner in which the waters receded from time to time was not taken into account. Because of the irregular shape of the lake, a division made by running the side lines of the various fractions to the center would be unequal, and unjust to the owners of those fractions peculiarly situated, and apparently for this reason the central-point principle of division was rejected. It is apparent that in the method adopted there was an attempt to combine two systems—one running the side lines to the center points of the lake, and the other to run them to center lines, which, theoretically, were the thread or middle of the stream.

The application of the center-line principle to this lake presents very serious difficulties. In the first place, we discover no rule according to which the center lines were established, except that they were run from

the three principal points, F, D, and E, Fig. 1, to the center point C, as nearly as possible equidistant from the adjacent shore. The question arises at once, what better reason is there for running a center line from F, in the manner indicated, than from the bay in lot 11, section 18, or from the bay in lots 8 and 9, section 18? And, if the center line may properly begin at the shore line F, why should not the center line, D, be extended to the shore at the west line of lot 4, section 20, and why should not the center line terminating at E be extended to the shore between lots 3 and 4, or between 2 and 3? It is evident that these lines were drawn and center points located without reference to any natural condition of the original lake, either in respect to depth or natural current, and, so far as we are able to see, resulted in arbitrary division without regard to the legal rights of the owners.

There is no doubt that the division must be made according to the principle applicable to accretions or relictions, as noticed in Hanson v. Rice, supra. As before stated, where the shores of a lake are comparatively even, and the lake is either round or long, few difficulties arise in applying one of the principles of division above mentioned; but where the shore line is uneven, and the body of water of an irregular shape, the difficulty comes in avoiding a conflict of different interests.

In the New England states many questions have arisen in reference to the division of lands which have accumulated along the seashore between low and high water mark, and the courts have aimed to establish a principle which would result in giving the riparian owners an equal division in the accumulated soil. For instance, in Gray v. Deluce, 5 Cush. 9, in dividing the flats which had accumulated in a cove between high and low water, a base line was run across the mouth of the cove, and parallel lines were drawn at right angles with the base lines from the ends of the division lines of the channel to low-water mark. In that case the flat to be divided was of the same width as the channel, and the result was that each proprietor was given an equal division, and the division lines could, therefore, be extended without variation. But in the case of Rust v. Boston, 6 Pick. 158, the cove was circular, and the distance across its mouth shorter than the shore line of the upland, and the division was made by causing the side lines to converge upon the base line at the mouth of the cove so as to divide the accumulation proportionately. Again, in the case of Emerson v. Tay-

lor, 9 Greenleaf, 42, there was a conflict of interests, and the base line was drawn between the two points where the side lines of division crossed the high-water mark, and from such base line, at right angles to it, lines were extended to low-water mark, and, the shore being on a curve, the various extensions thus made left a surplus or loss, which was divided evenly between the adjoining parcels. A review of many of the New England cases upon this subject will be found in a note to Northern v. Bigelow (84 Wis. 157) 21 L. R. A. 776. In all of them the courts were dealing with the space left bare by the receding waters, or with land which had accumulated, the main body of water being still in existence.

The principle running through the decisions is that the riparian owner actually owns that part of the accretion which lies between the points where the division lines cross the margin in a straight direction to the center of the channel, and, if there is no channel, then converging to a common center. Cases have arisen where, from the very nature of the situation, these general rules could not be strictly applied. As stated in Walker v. Boston, 3 Cush. 1, 22:

"Many coves, inlets, and estuaries of rivers are so irregular and various in outline, and so traversed by crooked and meandering creeks and channels, from which the sea does not ebb, that it is utterly impossible to apply to them any of the rules which have been applied to other cases."

The difficulty to be anticipated in dividing up the bed of a lake where there is no center line is stated by Justice Campbell in Lincoln v. Davis, 53 Mich. 375, 390, 19 N. W. 103: "In carrying out lines of ownership in narrow streams, it is easy to find the general course of the stream, and to draw lines perpendicular to that course from the terminal shore lines. But on lakes all lines from the shore tend to converge in some central part of the lake, and, while irregularity of shape prevents drawing them to a common center, they must all, if protracted, cross each other in a perplexing way. The rule adopted in such waters, where the whole surface could be appropriated, has always been to divide the water area in proportion to the shore frontage, and never to attempt any division by lines run from the shore, except over such parts of the lake as are substantially adjacent to the shore. In some cases, by a fair partition, a shore owner would, by his extent of shore

line, obtain a share beyond the center. But it seems impossible, if the whole water is to be regarded as divided up, to reach a division without some proceeding in the nature of a partition, which will fix the various possessions."

And again, in the case of Jones v. Lee, 77 Mich. 35, 40, 43 N. W. 855, the same learned justice, in discussing the general question, states: "It appears clearly enough in the present case that, while there is a considerable frontage facing northwest or southeast, the lake being longest in that direction, there must also be large end frontages which look up or down the lake perpendicularly, or nearly so, to any line across from bank to bank, at most places along the shores. If this body of water were not navigable, and if all its waters could in any way be apportioned among the riparian proprietors for any lawful purpose, it is evident that it could not be done by reference to any filum aquæ, or middle thread, but must be done by some rule of proportion, which probably could only be got at by some partition proceeding, inasmuch as such waters are common for all ordinary uses."

And in Hardin v. Jordan, 140 U. S. 371, 402, 11 Sup. Ct. 808, the court says: "If there should arise any question between the plaintiff and other riparian owners of lands situated on the margin of the lake as to the convergence of the side lines of the plaintiff's land in the lake, it can be disposed of by the parties themselves by a resort to equity, or to such other form of procedure as may be proper." And in referring to the difficulties of applying the general rules of division it was said: "Where a lake is very long in comparison with its width, the method applied to rivers and streams would probably be the most suitable for adjusting riparian rights in the lake bottom along its sides, and the use of converging lines would only be required at its two ends." Page 398.

To return to a consideration of the lake bed in question, eliminating the center line theory for the reason already stated, we are unable to apply any principle of ownership to the disputed land except the one already recognized by this court in the decisions above noted; i. e., that the several riparian proprietors own that portion of the increase immediately adjacent to and included in the triangle made by projecting lines from the points where the side division lines respectively cross the marginal line to the center of the lake. Had the waters only

receded a few rods from the marginal line, there would be little diffi-
culty in dividing up the strip of land thus laid bare; but in proportion
as the water receded toward the center the difficulties would increase,
and, now that the water has entirely disappeared, we find the side lines
converging upon one another to such an extent that the rule cannot be
strictly applied.

Whatever inequalities or injustice may arise from these conflicting
interests caused by the irregularity of the shore must be solved upon
some equitable basis which will, as nearly as possible, give to each pro-
prietor that portion of the increase which belongs to him.  In the first
place, what is the center of the lake bed?  Is it the center of the figure
(lake bed), or is it the deepest portion to which point the waters grad-
ually receded and at last disappeared?  The latter might coincide with
the former, but, where the two do not coincide, which should control?
If the waters had receded, leaving some of these small bodies of water
at different points in the original lake, division might be made upon the
theory that they constitute independent lakes, to be treated as central
points.  But, as a general rule, such conditions do not exist, and the
center of the figure must be accepted as the common center.

An examination of the plat Fig. 2, where a central point, C, is as-
sumed, discloses that, if a division be made according to this principle,
lot 1, section 20, will have an advantage over lot 2, which lies imme-
diately south, on account of the peculiar formation of the point or pro-
jection of land which extends into the lake.  The same thing occurs
in lot 4, section 17, and lot 10, section 18, the latter having the ad-
vantage, and a difficulty arises as between lots 10 and 11, section 19.
The chief difficulty, however, is in reference to lots 1, 12, and 14,
at the western end of the lake.

Commencing with lots 1 and 2, in section 20, lot 1 should not be per-
mitted to have the advantage given it by the projection into the lake
at the intersecting line between 1 and 2.  The inequality occasioned
by this irregularity in the shore ought to be divided between the parties
immediately affected.  It is a fair adjustment as between the two lots
that such projection be ignored, and the division line running to the
center point start, not at the marginal line, but at the point where the
division line of lots 1 and 2 crosses a line drawn from the point where
the northerly side line of lot 1 crosses the marginal line to the point

where the south line of lot 2 crosses the marginal line as indicated on Fig. 2. This would result in giving to lot 2 a slight portion of the increase directly in front of the southwest corner of lot 1. The same principle applied to lot 4, section 17, and lot 10, section 18, makes an equable division, as indicated on the plat. In respect to lots 10 and 11, section 19, the inequality may be adjusted as indicated on the plat. This arrangement gives lot 10 all it is entitled to, and gives lot 11 no credit for the small bay of the lake where the dividing line between the lots crosses the marginal line.

Lot 12, section 18, bordering on the southwest corner of the lake, had a considerable water frontage, but, on account of the peculiar shape of the point of land at the southerly part of lot 11, the division line between lots 11 and 12 crosses the marginal line at a point too far south to leave any considerable portion of the lake bed adjacent to lot 12, and the interests of lots 1, 11, 12, and 14 conflict in any attempt to divide up the bed immediately in front of those lots. There are two ways of adjusting this inequality: First, by disregarding the point of land at the southerly end of lot 11, and dividing the space on the principle applied to lots 1 and 2, section 20; and, second, treat the bay bordering on lots 1, 14, and 12, west of the dotted line A, B, as an independent lake. The latter method might very properly be applied if, as the waters receded, some portion were cut off from the main part of the lake by a ridge across the neck of the bay, or if there were a deep central point where the water remained last. The evidence is silent on the subject, and we can only assume that such condition did not exist, and that the lake bed slopes gradually from west to east. However, even if such were the case, this bay may be treated by analogy as a separate lake, and by so doing the interests would appear as indicated in the plat Fig. 2, assuming D to be the center point. This arrangement leaves the irregular tract A, B, D, C, less the portion of lot 11 within its borders, the property of the owners of lots 1, 14, and 12, which should be apportioned between them by the court in accordance with the acreage acquired by each in the bay west of the dotted line A, B.

We are aware that in applying this method of dividing the lake bed it will be a matter of some difficulty to find the exact center points. They may be located by the interested parties by common consent,

and, if they cannot agree, a competent surveyor can ascertain them by actual tests, or by the application of a mathematical rule which is used for the purpose.   It is also apparent that some of the divisions of land thus allotted would be of no practical value on account of their peculiar shape.   No doubt the small tracts would be purchased by the larger holders, or be otherwise adjusted to make the land practically useful.

The method of adjustment here suggested may not be suitable for the division of all irregular lake beds, but we have aimed to outline a plan which will give the riparian owners as near as possible what is theirs by law.   Let it be understood that the effect of this decision is not to direct a division of the lake in question according to Fig. 2.   We have attempted only to lay down certain principles which may be applied in case the facts shall prove to be as we have assumed them to be. Upon a new trial evidence should be taken as to the history of the lake, and the division worked out as near as may be in accordance with the principles herein defined.

Order reversed, and new trial granted.