(64 Misc. Rep. 149.)

### CALKINS v. HART.

(Supreme Court, Special Term, Onondaga County. July, 1909.)

1. BOUNDARIES (§ 16*)—WATERS—"THREAD OF THE LAKE."

Every abutting owner on a lake is entitled to the land under water in front of his premises to the "thread of the lake," which, where there is no outlet or inlet, passes through the center of the lake along its longest diameter.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 114; Dec. Dig. § 16.*

For other definitions, see Words and Phrases, vol. 8, pp. 6963, 6964.]

2. BOUNDARIES (§ 16*)—WATERS—THREAD OF LAKE.

Where there are deep bays or inlets in a lake, in determining the right of abutting owners to land under water, a line will be drawn from the center line of the lake to the thread of the bays or inlets to their extremity, to determine the boundaries of such right, just as a line is drawn from the center of a stream through the center of its tributaries.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 114; Dec. Dig. § 16.*]

Action by James S. Calkins against James M. Hart. Verdict for plaintiff. Motion for new trial denied.

Francis D. Culkin (D. P. Morehouse, of counsel), for plaintiff.
L. C. Roe (Udelle Bartlett, of counsel), for defendant.

ANDREWS, J. Spring Lake is in the town of Hannibal, Oswego county. It is oval in shape, without outlet or inlet, two-thirds of a mile long, north and south, and half as broad. The plaintiff owns land bounded on the west by the lake. Next south of him is land of the defendant. One Bezaliel Howe is the common source of the title of both parties. That of the plaintiff originated in 1836 and 1838; that of the defendant, in 1854. Under their deeds, both own to the center of the lake. Wilcox v. Bread, 92 Hun, 9, 37 N. Y. Supp. 867; Deuterman v. Gainsborg, 9 App. Div. 151, 41 N. Y. Supp. 185; Gouverneur v. National Ice Co., 134 N. Y. 355, 31 N. E. 865, 18 L. R. A. 695, 30 Am. St. Rep. 669; Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428.

The serious question, however, is what is meant by the "center of the lake." Is it the point at the geographical center, so that each abut-

---

ter would be entitled to a triangular parcel of land under water, with its apex at this point and his shore line for the base, or is it a line drawn through the longest diameter of the lake? If the former, the defendant was not a trespasser, and a verdict should have been directed in his favor. If the latter, the verdict must stand. Or are there other possibilities? May a combination of the two rules be applied? Or will the whole lake be apportioned among the abutters in such proportion as their shore line bears to the total shore line, in the same way as alluvion is sometimes divided among adjoining riparian or littoral owners? O'Donnell v. Kelsey, 10 N. Y. 412; Northern Pine Land Co. v. Bigelow, 84 Wis. 157, 54 N. W. 496, 21 L. R. A. 776, and note; Commonwealth v. Roxbury, 9 Gray (Mass.) 521, and note. Or, while abutters are not tenants in common, are their rights so uncertain that in the case of every lake and pond the courts will step in and make the division that seems just in that particular case?

There are few authorities on the question, but a reference to them and to the dicta sometimes found shows the difficulties of the problem. In Scheifert v Briegel, 90 Minn. 125, 96 N. W. 44, 63 L. R. A. 296, 101 Am. St. Rep. 399, the question arose with regard to a lake of irregular shape. The trial court divided the bed of the lake by the use of a combined system of lines and points. On appeal the Supreme Court held that this was wrong; that the geographical center of the lake should be found, as well as the geographical center of certain of the larger bays; and that lines should be run from these centers to the outer boundaries of the lands of the various abutting owners. Where, as in certain instances, such as lot 10 in section 19, and lot 1, section 20, this rule did not seem to produce a just result, it was varied. But apparently no rule was adopted by the court which could be applied in all cases, or which in fact was applicable to any lake except the one then under discussion. It says:

"The method of adjustment here suggested may not be suitable for the division of all irregular lake beds; but we have aimed to outline a plan which will give the riparian owners as nearly as possible what is theirs by law. Let it be understood that the effect of this decision is not to direct a division of the lake in question according to Fig. 2. We have attempted only to lay down certain principles, which may be applied in case the facts shall prove to be as we have assumed them to be."

In Grand Rapids Ice & Coal Co. v. South Grand Rapids Ice & Coal Co., 102 Mich. 227, 60 N. W. 681, 25 L. R. A. 815, 47 Am. St. Rep. 516, a similar question arose. The headnote of that case states that:

"Unless the contrary appear, a grant of land bounded by a water course conveys riparian rights, and the title of the riparian owner extends to the middle line of the lake or stream."

No such holding was necessary in the case, and in fact the opinion quotes with approval from two other Michigan cases which do not support this doctrine. Lincoln v. Davis, 53 Mich. 390, 19 N. W. 111, 51 Am. Rep. 116; Jones v. Lee, 77 Mich. 35, 43 N. W. 855. In the first the court said:

"In carrying out the lines of ownership in narrow streams, it is easy to find the general course of the stream, and to draw perpendicular lines to that course from the terminal shore lines. But on lakes all lines from the shore

tend to converge in some central part of the lake; and, while irregularity of shape prevents drawing them to a common center, they must all, if protracted, cross each other in a perplexing way. The rule adopted in such waters, where the whole surface could be appropriated, has always been to divide the water area in proportion to the shore frontage, and never to attempt any division by lines run from the shore, except over such parts of the lake as are substantially adjacent to the shore. * * * But it seems impossible, if the whole water is to be regarded as divided up, to reach a division without some proceeding in the nature of a partition, which will fix the various possessions.".

In the second:

"It appears clearly enough in the present case that while there is a considerable frontage facing northwest or southeast, the lake being longest in that direction, there must also be large end frontages, which look up or down the lake perpendicularly, or nearly so, to any line across from bank to bank, at most places along the shores. If this body of water were not navigable, and if all its waters could in any way be apportioned among the riparian proprietors for any lawful purpose, it is evident that it could not be done by reference to any filum aquæ, or middle thread, but must be done by some rule of proportion, which probably could only be got at by some partition proceeding, inasmuch as such waters are common for all ordinary uses."

In Bristow v. Cormican, 3 App. Cas. 641, 666, Lord Blackburn said:

"Whether the rule that each adjoining proprietor, where there are several, is entitled usque ad filum aquæ, should apply to a lake is a different question. It does not seem very convenient that each proprietor of a few acres fronting on Lough Neagh should have a piece of soil of the lough many miles in length tacked on to his frontage."

In Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428, a portion of the lake in question is shown in the plan on page 373 of 140 U. S., and page 809 of 11 Sup. Ct. (35 L. Ed. 430). In dividing such lake the court says:

"Where a lake is very long in comparison with its width, the method applied to rivers and streams would probably be most suitable for adjusting riparian rights in the lake bottom along its sides, and the use of converging lines would only be required at its two ends. But whatever mode of determining the outgoing lines, as between adjoining owners, should be adopted in special cases (which may be left for determination when they arise), there can be no difficulty in the present case as between the plaintiff and the defendant."

And the conclusion of the court was that the plaintiff was entitled to the land in front of his premises to the center of Wolf Lake, adding that:

"If there should arise any question between the plaintiff and other riparian owners of lands situated on the margin of the lake, as to the convergence of the side lines of the plaintiff's land in the lake, it can be disposed of by the parties themselves by a resort to equity or to such other form of procedure as may be proper."

Apparently in this case the plaintiff's premises were situated at the end of the lake. Precisely what the center was, of which the court speaks, does not appear.

In State of Indiana v. Milk (C. C.) 11 Fed. 389, Judge Gresham says:

"Nonnavigable streams are usually narrow, and the lines of riparian owners can be extended into them at right angles, without interference or confusion, and without serious injustice to any one. It was therefore natural, when such streams were called for as boundaries, to hold that the real line between opposite shore owners was the thread of the current. The rights of the riparian proprietors in the bed of the stream, and in the stream itself, were thus

clearly defined. But when this rule is attempted to be applied to lakes and ponds, practical difficulties are encountered. They have no current, and, being more or less circular, it would hardly be possible to run the boundary lines beyond the water's edge, so as to define the rights of shore owners in the beds. Beaver Lake is 7½ miles east and west, and less than 5 miles north and south. Extending the side and end lines into the lake, there being no current, when would they meet?"

In Ledyard v. Ten Eyck, 36 Barb. 102, the court held that on Cazenovia Lake, a body of water about five miles long and three-fourths of a mile wide, with a small outlet and inlet, a deed bounded by the lake carried the premises usque ad medium filum aquæ. In Marshall v. Ulleswater Steam Navigation Co., 3 Best & Smith, 732, the court assumes that the soil of lakes, like that of fresh-water rivers, belongs prima facie either to the king or to the owners of the abutting lands ad medium filum aquæ. In Bloomfield v. Johnston, 8 Ir. Com. L. R. 68, the same assumption seems to be made. In Ridgway v. Ludlow, 58 Ind. 248, the court held that the owner of land bordering on a nonnavigable lake is the owner of the bed of such lake to the thread thereof. In Lembeck v. Nye, 47 Ohio St. 336, 24 N. E. 686, 8 L. R. A. 578, 21 Am. St. Rep. 828, it was said that the owner of land bounded by a lake, the length of which is distinguishably greater than its breadth, owns to the center thereof. The opinion further says:

"That practical difficulties in the application of the rule may arise where the lake is so nearly round that it cannot be said to have any length as distinguishable from its breadth, or when the side lines of the respective parcels of land bounding on the lake approach it in such direction that, if they should be extended to the center thereof, they would cross each other, is apparent. The latter difficulty is not at all unusual in the case of lands bounding on running streams, but does not prevent the application of the rule. * * * Whether there are in Ohio nonnavigable lakes of such shape that no length can be affirmed of them does not appear. If there are any such, and the rule, applicable to running streams and to nonnavigable lakes distinctly longer than they are wide, cannot be applied to them, other appropriate rules must be adopted, which, in the light of all the circumstances, may be regarded as effectuating the intention of the parties, and are consistent with public policy."

As there is, therefore, no agreement as to the principle to be applied in such cases, and as there is no decision in this state which determines the question in dispute, it seems important that some fixed rule should be adopted with regard to the division of such lakes among abutting owners—a rule that is general in its application and that is as simple as may be under the circumstances. Because of the difficulties involved, to say that there can be no such rule, that no man having property bounded on a lake can have any guide to his conduct or any accurate knowledge as to what his property rights are until the courts have stepped in and have made a division, would be to incite litigation.

Instances can be imagined where any rule will work out curious results. Take the case of Scheifert v. Briegel, supra. The owner of the south half of the point on the east side of Swan Lake would have a shore line in line with the geographical center of the lake. Under the geographical center theory, therefore, his interest in the bed of the lake would consist simply of this line. To obviate such a finding the court makes an arbitrary extension of his lines, so as to give him title

to a portion of land under water at the expense of his neighbor. Or, take the owner of an acre of land at the outlet of Skaneateles Lake, a curved lake some 15 miles in length; under the geographical center theory he would be entitled to a triangular piece of land some 208 feet across its base and 7½ miles long.

On the contrary, under the center line theory the owner of land bounded by the square end of a lake a mile wide and a mile and a half long would have no interest whatever in the land under water in front of his premises. But the same thing would happen to the owner of property facing the end of a street. Or a lake might be so nearly round that it would be difficult to say what is its greatest diametei. As for the use of converging lines at the ends of the lake, as suggested by Hardin v. Jordan, supra, it would render the rights of proprietors near those ends as uncertain as are the rights of all the proprietors under the suggestion that the courts must divide each lake according to the equities of each particular case.

On the whole, therefore, I shall adopt the rule which applies to non-navigable streams. Each abutting owner is entitled to the land under water in front of his premises to the thread of the lake. Where, as in the case of Spring Lake, there is no outlet or inlet, this thread passes through the center of the lake along its longest diameter. In this particular instance there are no deep bays or inlets to complicate the question. Where such exist, the rule with regard to streams may still be the guide. A line will be drawn from the center line of the lake, through the thread of such bays or inlets, to their extremity, just as a line is drawn from the center of a stream through the center of its tributaries.

Applying this rule to the case at bar, the facts were properly submitted to the jury, and the verdict is sustained by the evidence. The motion for a new trial is, therefore, denied, with $10 costs.

Motion denied, with $10 costs.