No. 87-14

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

TERRY L. STIDHAM and NORMA STIDHAM,
husband and wife,
          Plaintiffs and Respondents,
     -vs-

CITY OF WHITEFISH, MONTANA,
          Defendant, Appellant and Respondent,

CITY OF WHITEFISH, MONTANA,
          Defendant, Third-Party Plaintiff,
          Appellant and Respondent,
     -vs-

MORRISON-MAIERLE, INC.,
          Third Party Defendant and Appellant.

APPEAL FROM:  District Court of the Eleventh Judicial District,
              In and for the County of Flathead,
              The Honorable Nat Allen, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Keller, Reynolds, Drake, Sternhagen & Johnson;
          Thomas Q. Johnson argued for Morrison-Maierle, Helena,
          Montana

     For Respondent:

          Moses Law Firm; Stephen C. Moses argued for Stidham,
          Billings, Montana
          Leo W. Tracy argued for City of Whitefish, Montana

                              Submitted: June 30, 1987

                              Decided: November 13, 1987

Filed:  NOV 13 1987

                    Ethel M. Harrison
          _____
                         Clerk

Mr. Justice R.C. McDonough delivered the Opinion of the Court.

Morrison-Maierle, Inc., and the City of Whitefish appeal a judgment in favor of plaintiffs, filed and entered in the District Court of the Eleventh Judicial District, County of Flathead. We set aside the judgment and remand.

This case originated as an action in trespass by plaintiffs and respondents (Stidhams) against the City of Whitefish. The City filed a third-party complaint against Morrison-Maierle, Inc. The City built a water pumphouse with inlet pipes on lot 4 located on the edge of Whitefish Lake. The property was leased from Burlington-Northern, Inc. Morrison contracted with the City to provide the engineering services for the pumphouse project. Stidhams claimed that part of the pumphouse was actually built on a part of lot 5 which is owned by them. The City denied that the pumphouse was built on lot 5 and if it was, Morrison, as the engineer, was responsible for the error. Morrison also denied that the pumphouse was located on lot 5 and denied that they had the responsibility to properly locate the pumphouse.

The District Court on its own motion bifurcated the case ordering that the first trial concern only the boundary line issue. The parties stipulated that the balance of the issues, including the question of the City's and Morrison's defense of estoppel and laches, would be tried at the second trial. At the first trial the court found that Stidhams were relying on the correct boundary, and pursuant to a motion for summary judgment found that Morrison, and not the City, was responsible for any damages caused by the location of the pumphouse. Morrison made appropriate motions relative to such findings and conclusions which were denied. Morrison

then asked for certification of such findings and conclusions as final which the court refused to do.

The case was set for the second trial and was determined to be an inverse condemnation case on motion of the City and Morrison. The court pursuant to Stidham's motion ruled that the defenses of laches and estoppel were incompatible with the theory of inverse condemnation and struck the defenses. A jury trial was held and a verdict of $61,000 had in favor of plaintiff. After the usual motions, which were denied, appeal was taken by Morrison and the City from the judgment.

The issues for review are:

1. Whether the City reserved its right to appeal the boundary line and ownership issue and the estoppel and laches issue?

2. Whether Morrison can properly appeal the boundary line and ownership issue, the estoppel and laches issue, and the certification issue?

3. Whether the District Court's findings of fact and conclusions of law relative to the location of the boundary line were clearly erroneous and not supported by substantial credible evidence?

4. Whether the District Court erred in striking the defenses of laches and estoppel?

5. Did the District Court err in granting judgment to the City and against Morrison regarding their relationship and responsibility?

6. Did the District Court err in not certifying its findings of fact and conclusions of law as final and thereby allowing this matter to go up on appeal following the first phase of the trial and in advance of the second?

3

As to issues 1 and 2, the City, although they did not present any witnesses of their own at the first trial, through the pleadings, pre-trial order, proposed findings of fact and conclusions took the same position as the proposed contentions, findings and conclusions of Morrison. The City appealed in its notice the issues involved. Throughout the trial, the City actively contested Stidham's boundary contention and asserted its contention of laches and estoppel. Thus, the City may appeal these issues.

Neither is Morrison precluded from appealing its boundary line and ownership issue, the laches and estoppel issue, and certification. Stidhams proposed that Morrison was not a real party in interest to the boundary line and ownership dispute or the laches and estoppel issue, but was only involved as a third party defendant with the issues of its contract with the City. Throughout the record, Morrison actively opposed Stidhams' contentions and supported its own contentions relative to these matters. Stidhams made no objection in the lower court to Morrison as a party, and they are barred from raising it on appeal. In view of the District Court ruling that Morrison was responsible for any and all damages recovered by Stidhams against the City, Morrison was a real party in interest.

The District Court's decision as to issue No. 3 is affirmed in part and reversed in part. Lot 4 is a government subdivision with a meander line bordering on Whitefish Lake. Instead of the usual 40 acres it contains only 39.95 acres. The remaining .05 of an acre of lot 4 is in the lake if the boundary lines were to be extended into the lake to make a full 40 acre governmental subdivision. The original government survey cut off a small portion of the northeast

4

corner and surveyed a meander line along the shore of the lake.  See following plat.



Line in dispute

The parties dispute the location of the line dividing lots 4 and 5.  None of the original government monuments material to this case were found by the surveyors.  Nor were there any government monuments found which could be used as reference points.

The west line of lot 5 (also the east line of lot 4), as proposed by Stidhams, would run through the middle of the pumphouse.  Morrison and the City proposed a line which located the pumphouse and inlet pipe entirely within lot 4, which is controlled by the City.  Expert opinion and other competent and relevant evidence was offered by both sides as to their respective positions.  The District Court in its findings of fact found the Stidham line to be the correct line.  The court's determination is not clearly erroneous and is supported by substantial credible evidence.  We will not disturb its findings.

Morrison and the City contend the Stidham land, according to the description in the deeds from Stidham's predecessors, extends to Morrison's and the City's proposed west line of lot 5.  This is true according to Morrision and

5

the City because by computing the courses and the distances of the southern boundary (railway's northeast right-of-way boundary) along the track center line reference points of the railway, as provided for in the deed, it can only lead to the conclusion that their line is correct. The description to which they refer commences as follows:

> All that part of Lots Five (5) and Six (6) of Section Twenty-six (26) Township Thirty-one (31) North, Range Twenty-two (22) West of the Montana principal meridian, lying North of the following described boundary:
>
> Beginning at a point in the West line of said Lot Five (5) One Hundred (100) feet distant Northeasterly, measured at right angles, from the center line of said main track of said railway, as now located and constructed; thence Southeasterly parallel with said center line . . .

However, the land described by this wording is the land bounded on the west by the west line of lot 5 for it begins "at a point in the west line" of lot 5. The west line of Stidhams' land described in the deeds is the true west line of lot 5 wherever it may be on the ground. The court is aware that by basing the south boundary of the tract on a course and distance description using the Stidhams' west line as the true line leaves a gap in the south line between Stidhams' west line of lot 5 and the east line of lot 6 (the end of the description). However, the description states the beginning point of the south boundary is on the west line of lot 5, wherever it may be located, and the south boundary ends on the east line of lot 6. The location of the south boundary is not at issue. The reference to these boundary lines takes precedence over the course and distances which might be described in between as contended by the City and Morrison. See § 70-20-201, MCA.

6

However, the District Court erred in establishing the disputed boundary between the shoreline as shown in the original survey and the shoreline as it is today. The finding assumes that the west line of lot 5 continues on the same course north from the meander corner as produced to its intersection with the north lot line of lot 4 as it is produced eastward. This is incorrect. It is only the true line to its intersection with the low water line of the lake at the time of the original survey, which is referenced by the meander corner on said west line. Some of Stidhams' plats introduced in evidence show only a minute corner of such lines produced and put the north line of lot 4 and the west line of lot 5 (east line of lot 4) barely in the lake and such minute portion is only a small fraction of the .05 of an acre as shown to be in the lake in the original government plat. Some of the Stidhams' plats actually show such produced corner to be on land and they argue in their briefs that such corner is on land.

Since the District Court adopted the Stidham proposed line as the west line of lot 5, it must also be concluded that what would be the northeast corner of lot 4 if boundary lines are produced is on land or barely in the lake, and thus the lake has receded. The location of corners and lines established by the government survey is conclusive and the true corners are where the United States surveyors in fact established them. Stephens v. Hurley (1977), 172 Mont. 269, 563 P.2d 546.

If the triangular area of .05 of an acre in the water cut off of the 40 acre tract in the original government survey of lot 4, would have equal sides of 66 feet, the length of the meander line of lot 4 would be 93 feet more or less, and the length could vary slightly depending on

7

separate lengths of the other two sides of the triangle. The original government field notes should have the correct length of the meander line. In other words, we have a meander line of lot 4 of roughly 93 feet of shoreline. Under the Stidhams' line there is very little shoreline if any, adjacent to lot 4. Therefore the lake has receded. By what means it has receded the record does not disclose.

On the receding or reliction of a lake the law does not extend the original boundary lines on the same courses and directions they were on land, which has been done here. A riparian owner has the right of access to the water and his access cannot be destroyed by the changing of the level of the water by gradual recession. He has the right to preserve his contact with the water by appropriating the accretions of the land exposed by reliction which form along the shore. Land formed by accretion or reliction becomes part of the shore and the riparian owner acquires title to the water. See 78 Am. Jur. 2nd Waters § 418 (1975); J. Grimes, Clark on Surveying and Boundaries § 573 (4th ed. 1976); 2 R. Patton & C. Patton, Patton on Titles § 300 (2d ed. 1938). He has a share in the land left exposed by the receding of the lake.

The general principle which governs how the relicted exposed shoreline is divided between the lot owners on the lake is any division of the relicted land shall be equitable and shall be proportional so far as to give each shore owner a share of the land to be divided relative to his portion of the original shoreline. See 2 R. Patton & C. Patton, Patton on Titles § 302 (2d ed. 1938); 3 H. Farnham, The Law of Waters and Water Rights § 841 (1904); 78 Am. Jur. 2d Waters § 422-25 (1975). For an example of how this principle could

8

apply to this case, see following plat:



To draw this boundary line the starting points are at the meander corners as per the original government survey. In this case the corners are located, one, on the north line of lot 4 and two, on the east line of lot 4, which is the same as the west line of lot 5. If a lake is round and not jagged these lines are usually extended from the meander points to an imaginary point in the center of the lake or a cove of the lake. If the lake is long and narrow and somewhat jagged, the lines could be extended from the meander corners to an imaginary base line running the long way of the lake along the center of the lake and at right angles to the base line.

In this case, the boundary drawn by the District Court ignores the reliction rule. Instead of drawing the lines so that lot 4 would retain a proportionate share of lake front, the lines are continued on their original path. The result is loss of shoreline for lot 4 and a violation of the rule. To correct this error, the lines should be drawn in a northeasterly direction instead of a northerly direction starting from the point where the lines intersect the

original shoreline. The plat above shows the possible boundary lines in the relicted portion. J. Grimes, Clark on Surveying and Boundaries §§ 573-75 (4th ed. 1976); 2 R. Patton & C. Patton, Patton on Titles § 302 (2d ed. 1938); 3 H. Farnham, The Law of Waters and Water Rights §§ 841-43 (1904). See also Karterud v. Karterud (S.D. 1923), 195 N.W. 972; Scheifert v. Briegel (Minn. 1903), 96 N.W. 44; Kapp v. Hansen (S.D. 1961), 111 N.W.2d 333.

Therefore, the west boundary of lot 5 (east boundary of lot 4) north of the meander corner has not been properly established. That leaves open the possibility that the pumphouse lies entirely within lot 4, and a portion of what now is thought to be part of lot 5 is actually controlled by the City as part of lot 4.

We therefore vacate the judgment in this action and remand to the District Court for a proper survey of the boundary line between lots 4 and 5 north and east of the common meander corner in the relicted portion of the lake pertaining to these lots. Even if a portion of the pumphouse would still be within lot 5, a different shape and size of land would be taken by the inverse condemnation. A survey to establish the location of the west lot line of lot 5 north of the common meander corner with lot 4 should be done in accordance with the principles of law as above set forth.

To assist the court in future actions taken by it pertaining to this case we will discuss issues 4 and 5 raised by the appeal. Issue 6 by virtue of this opinion is moot.

Did the District Court err in striking Morrison's and the City's defenses of laches and estoppel? No. The City and Morrison by motion which was granted by the court, converted this action to one of inverse condemnation. Their

10

defenses of estoppel and laches were then inappropriate and had no application.

Issue number 5 is whether or not the Court erred in granting summary judgment in favor of the City and against Morrison regarding their relationship. The City moved for summary judgment contending that co-defendant Morrison was solely liable for any wrong committed in locating the pumphouse and inlet pipes. The motion was filed, briefed, argued and submitted. The Court did not rule on it before the first trial. However, after the first trial the court ruled in its findings of fact and conclusions of law that Morrison was solely liable. The parties had previously stipulated that their relationship would not be an issue at the first trial, and did not present evidence directed toward this issue. There is a contested question of fact of who between the City and Morrison had the responsibility for and who did actually locate the site for the pumphouse. The order is in error and such order granting the motion for summary judgment is vacated.

The verdict and judgment are vacated and the case is remanded for further proceedings in accordance with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

11

District Judge Russell K. Fillner sitting for Justice John C. Harrison, dissenting.

I dissent. "The world will little note nor long remember" * what I write here. Nevertheless, I will set forth briefly my reasons for not being able to concur with the majority opinion, as follows:

The majority holds that the trial Judge committed plain error (clearly erroneous) because he failed to find that Whitefish Lake receded! The majority "is asking for clairvoyance not even possessed by a trial judge." (Justice John Harrison's opinion in Mageli v. Daniels, 400 P.2d 896, at 898.) Was there any evidence produced at the trial showing that Whitefish Lake receded? No. Neither was the issue raised in the trial court, nor even in this court. The majority opinion holds that the trial judge's finding that the Stidham line is the correct boundary line between Lots 4 and 5 is supported by substantial and credible evidence; and therefore, the findings will not be disturbed. The majority then states that "it must also be concluded that what would be the northeast corner of Lot 4 if boundary lines are produced, is on land or barely in the lake, and thus the lake has receded." The majority then attempts to support this conclusion by indulging in assumptions that the .05 of an acre in the original government survey:

* Abraham Lincoln, Gettsburg Address

"would have equal sides of 66 feet, the length of the meander line of Lot 4 would be 93 feet more or less, and the length could vary slightly depending on separate lengths of the other two sides of the triangle. The original government field notes should have the correct length of the meander line." (Emphasis supplied)

The point is that this is not part of the record, although it should have been. While at first blush, the majority's conclusion that Whitefish Lake has receded may appear to be logical, if we assume that the Stidham survey is absolutely correct, but that is not the only logical conclusion. It is just as logical to assume that the shore of the lake in this area was pushed upward. How or by what means I am no more able to say than the majority can state by what means the lake has receded. Furthermore, even if the lake has receded, it is obvious that Morrison-Maierle must have been aware of the need for another survey to supplement the Stidham survey prior to trial. If the trial judge is in plain error for not recognizing the need for such additional survey, what excuse does Morrison-Maierle have? It certainly possesses the requisite engineering and surveying knowledge, resources and ability to have determined the proper boundary line under the equitable principles governing relicted exposed shorelines. Having failed to do so, it is hardly entitled to another bite at the apple. Morrison-Maierle elected to rely on the defense that Stidham didn't own the property and that the GN survey was the correct one.

13

The problem here is that neither party located the corners or lines, and particularly this boundary line, by reference to government surveys or monuments.* At oral argument, the Defendant, Morrison-Maierle, stated that it now knew where the true line was and would like to have an opportunity to prove it. If it has, in fact, gone back to some government monument and proceeded with its survey from that point, it may very well be that the line is otherwise than established by the Stidham survey. However, it had that opportunity at the trial level. The point being that none of the parties are contending that Whiefish Lake has receded or that the principles of reliction should apply in this case. Perhaps I can best bring into focus what I'm trying to say by this scenario:

Under the majority opinion as I read it, this case will be remanded to the District Court for the parties (which one is unclear) to make a survey based on the principles of reliction so that Lot 4 will have its same share of the shoreline as before the lake receded. So assume that is dutifully accomplished. This may or may not result in changing the boundary as regards the pumphouse. Now then, be it remembered that this boundary line is the boundary between lands owned by the Burlington Northern Railroad and the Plaintiffs (Stidham). The Burlington Northern Railroad is not a party to this suit.** So then, the Burlington

14

* In the light of a majority opinion in this case, the Legislature might want to take a look at enacting legislation that would require any surveying that involves shorelines on lakes and bodies of water in Montana be made with reference to government monuments, or that such survey, if based on a prior survey, that such prior survey be shown to have been based on government monuments. Any plat or survey not meeting such requirements could not be filed of record, nor used in evidence.

** although it should be. See Rule 19(a) and 21, M.R.Civ.P.

Northern Railroad, being unsatisfied with the Stidham survey, brings suit to establish the boundary line between Lots 4 and 5. It conducts a survey based on government monuments and, lo and behold, such survey establishes the line east of the Stidham line and, presto, Whitefish Lake has not receded after all. So what happens then? But even if the Burlington Northern should not bring suit, what will be the effect of this case on other boundary lines - past, present and future - on the shores of Whitefish Lake, if the level of Whitefish Lake has not receded as the court states it must have done? Finally, it is fortunate that Montana is not a coastal state when one contemplates the world-wide ramifications of such a decision on the shorelines of the Atlantic or Pacific Oceans.

I hope that it is obvious from what I have herein said that we simply do not know whether the Stidham line is absolutely the correct line. All that we can say is as the majority has stated, that the Court's determination is clearly not erroneous and is supported by substantial credible evidence. Justice Morrison, speaking for an unanimous court, in Rose v. Rose, 201 Mont. 86, 651 P.2d 1018, said:

> "The proper function of the trial court is to assess the evidence, ascertain the witnesses' credibility and render its findings based upon substantial credible evidence. If that is accomplished, this Court cannot overturn its decision. Crabtree v. Crabtree, (1982), 200 Mont. 178, 651 P.2d 29, 30 St.Rep. 1668."

15

The trial Court's determination, being supported by substantial credible evidence, should be affirmed.

I agree with the majority's conclusion that the District Court did not err in striking Morrison's and the City's defenses of laches and estoppel. As to Issue No. 5, I would affirm the granting of the City's motion for summary judgment. The motion was filed, briefed, argued and submitted as the majority found. While it is true that the trial court did not rule on it before the first trial, it did make its ruling thereafter. The majority just makes the conclusionary statement that "there is a contested question of fact of who between the City and Morrison had the responsibility for and who did actually locate the site for the pumphouse." The only "contested" facts presented by the Defendant, Morrison-Maierle, in that regard are that an Alderman of the City of Whitefish took one of Morrison-Maierle's employees to the site, suggesting that it might be an appropriate place for the pumphouse and that its contract with the City does not require it to do any survey work without additional compensation therefor. Those facts really aren't contested, but it is undisputed that the City leased Lot 4 from Burlington Northern for the purpose of locating the pumphouse thereon. Morrison-Maierle contracted to put the pumphouse on Lot 4. It relied upon an old survey done by the Great Northern Railway, predecessor in interest to the Burlington Northern Railroad. It's reliance on that line was obviously misplaced. That did not

16

change its responsibility to have placed the pumphouse as agreed in its contract with the City on Lot 4. This it failed to do. Accordingly, I would affirm the District Court's verdict and judgment in this case.

In conclusion, I am convinced that the majority's opinion is motivated by a search for truth, but what is truth? I rather believe that a lawsuit is a search for justice under the law. In that regard, see the remarks made by David Elderkin, a Cedar Rapids attorney for 50 years, published in the Montana Lawyer, October 1987, page 16, where he states that the claim that a lawsuit is a search for truth is nonsense. "While we must proceed by truthful means, a lawsuit is a search for justice and a timely, inexpensive system of dispute resolution is a real part of justice."

Here this case is being remanded to the parties to engage in further time-consuming and expensive surveying that none of the parties believe is necessary or warranted, which, instead of discovering the truth, will only serve to obfuscate it.

RUSSELL K. FILLNER , District Judge
sitting for Justice John C. Harrison

17